DUNKLIN *v.* BLACK.

5-546 275 S. W. 2d 447

Opinion delivered January 31, 1955.

[Rehearing denied March 7, 1955.]

*Bridges & Young,* for appellant.

*Rose, Meek, House, Barron & Nash,* for appellee.

MINOR W. MILLWEE, Justice.   L. A. Black of DeWitt, Arkansas died testate December 31, 1945, leaving a large estate consisting of farm lands, gins, a rice mill, mercantile businesses and related enterprises which he operated from his offices in DeWitt. Prior to his death he made substantial gifts to his three daughters, Hattie Boone Black, Georgea Oliver McKinley and Elizabeth Black. By his will Mr. Black devised one-third of his estate to his wife, Mary B. Black, and the remaining two-thirds to his daughters in equal shares. At the time of Mr. Black's death the oldest daughter, Hattie Boone, who is the appellee here, and the youngest daughter, Elizabeth, who is the appellant here, were living with their parents in DeWitt. Georgea McKinley and her family lived across the street and her husband, Ed I. McKinley, Jr., was working for Mr. Black.

A few days after Mr. Black's death sharp differences arose between the McKinleys on one side and Mrs. Black, Hattie Boone and Elizabeth on the other resulting in the McKinleys moving to Little Rock and an unfortunate social and business estrangement which continued for several years. A partition suit was immediately instituted by Mrs. McKinley to separate her two-ninths interest in her father's estate from that of her mother and sisters. A consent decree to this effect was rendered January 29, 1947.

On February 2, 1948 Mrs. Black executed a will which in effect disinherited Mrs. McKinley and devised her estate equally to Hattie Boone and Elizabeth. She had executed a similar will in 1946 during the partition litigation with Mrs. McKinley. Hattie Boone and Elizabeth continued to reside in DeWitt with their mother until May 28, 1949 when Elizabeth married and moved to Pine Bluff with her husband, George Dunklin.

On March 16, 1951 Mrs. Black added a codicil to the 1948 will so as to devise three specific farms to Elizabeth and the remainder of her property to Hattie Boone. According to certain estate tax returns the value of the three farms amounted to only 1.61 per cent of the total value of Mrs. Black's estate.

Mrs. Black died May 16, 1951. Upon a petition filed by appellee, Hattie Boone Black, an order was entered in probate court July 17, 1952 admitting the will and codicil to probate. Appellant, Elizabeth Black Dunklin, filed a contest of the codicil July 27, 1952 on the ground that it was procured by the undue influence of appellee over Mrs. Black while she was in ill health and a highly nervous condition; and the further ground that probation of said codicil was in violation of an agreement between the two sisters that the will would be probated without the codicil. This appeal is from the judgment of the Arkansas Probate Court dismissing the contest.

The evidence discloses that after the death of Mr. Black and the removal of the McKinleys to Little Rock, Mrs. Black, Hattie Boone and Elizabeth each took some part in the running of the estate left by Mr. Black which is still intact with the exception of the two-ninths interest allotted to Mrs. McKinley. The undistributed portion of said estate is valued at nearly $700,000.00 and appellant's two-ninths interest therein will amount to values in excess of $150,000.00. She also has an annual income of more than $50,000.00 from the properties given her by Mr. Black during his lifetime. After appellant's marriage in 1949 her relations with her mother and appellee continued to be cordial and pleasant. They visited each other frequently and made many business and social trips together. A daughter was born to appellant in September 1950.

A few days prior to execution of the codicil in question Mrs. Black and appellee visited in Memphis, Tennessee, returning to DeWitt on March 15, 1951. They planned to leave the next day on a three-weeks trip to

Florida. Appellant had visitors at the time and declined to make the Florida trip. On the morning of March 16, 1951 Mrs. Black and appellee drove to Pine Bluff on their way to Florida and appellee remained in the car while Mrs. Black went to the office of her attorney, N. J. Gantt, Jr., who drafted the codicil which Mrs. Black executed and left there with the will for safe keeping.

Appellee left DeWitt May 6, 1951 on a business trip to Chicago where she still remained until her mother's sudden death on May 16th. During this 10-day period appellant and Mrs. Black visited in each others homes and made a trip to Little Rock together. Following the death of Mrs. Black appellant stayed with appellee in DeWitt for a month. Upon the reading of the will appellant became very upset and, at Mr. Gantt's suggestion, there were considerable negotiations over an extended period between appellant and appellee relative to some arrangement whereby a division of property could be made without probating the codicil, but no final agreement was ever concluded.

After an extended hearing involving over 600 pages of testimony the chancellor rendered an exhaustive opinion setting forth his findings and conclusions bearing on the issue of whether appellee exercised undue influence over her mother in the execution of the codicil. In urging a reversal appellant points to certain discrepancies in the testimony of appellee and others, some of which were noted by the trial court. Appellant also insists that the court erred in at least two factual findings which caused him to reach an erroneous conclusion. At the same time appellee also argues that the court made erroneous conclusions on certain factual matters.

On the whole case we have concluded that the findings of the chancellor are fully supported by a preponderance of the evidence. We are also of the opinion that the court correctly applied the legal principles that have been repeatedly stated by this court in such cases as *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590;

*Sanger* v. *McDonald,* 87 Ark. 148, 112 S. W. 365; *Miller* v. *Carr,* 94 Ark. 176, 126 S. W. 1068; *Phillips* v. *Jones,* 179 Ark. 877, 18 S. W. 2d 352; *Brown* v. *Emerson,* 205 Ark. 735, 170 S. W. 2d 1019; *Shippen* v. *Shippen,* 213 Ark. 517, 211 S. W. 2d 433; *Toombs* v. *Blankenship,* 215 Ark. 551, 221 S. W. 2d 417.

The following statement from *McCulloch* v. *Campbell, supra,* has been cited with approval in most of our subsequent cases involving the question of undue influence: ''As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution.'' The facts constituting the undue influence are required to be far stronger in the case of a testator whose mind is strong and alert than in the case of one whose mind is defective or impaired by disease or advancing age. *Phillips* v. *Jones, supra.* On the other hand less evidence is required to establish undue influence where the disposition of the testator's effects is unaccountably unnatural. *Brown* v. *Emerson, supra.*

We concur in and adopt the opinion rendered by the chancellor which is as follows:

''The court listened attentively to the evidence in this case, and also requested the Reporter to read back from her notes certain portions of the testimony that seemed to touch more closely upon the legal question to be decided.

"At the outset, I might state that Contestant evidently abandoned the contention of a 'family settlement,' as this was not advocated, nor even mentioned, in counsel's argument; the proof, I feel sure all will agree, was not such, as to support any findings by the court that such a contention was valid, or established, and I accordingly, will not take the time to discuss that phase further.

"The question before the Court is simply 'was undue influence used and exerted by Hattie Boone Black upon her Mother, Mrs. Mary Black, to cause her to execute the codicil of March 16, 1951'? or, to express it in a different way, 'Did the codicil express the desires of Mary Black, or did it only express the wishes of Hattie Boone Black, under the cloak of her Mother's name and action?'

"Certainly, Mrs. Black had the legal right to dispose of her property in any manner that she saw fit, and the fact that such disposition might appear on its face to be unnatural, or inequitable, would have no bearing on the matter whatever—if such disposition expressed the will of Mrs. Black.

"The testimony of the Black daughters relative to their home life as children and young ladies, painted for the court a rather clear picture of living conditions in the Black home; and I might say that I don't know that they were greatly different from conditions in numerous other homes over the land that contain three daughters. Apparently, Mr. and Mrs. Black, who were religious and strong church members, were rather strict during the early lives of the girls, and along about the time that Hattie Boone was finishing high school. They didn't approve of dances and parties and seemingly prohibited Hattie Boone from attending very many. As time went on, and 'everybody else was doing it,' they, like thousands of other parents, then and now, relented somewhat and the next daughter, Georgea Oliver, was not placed under the same restrictions; by the time the youngest daughter had attained young womanhood,

she made her debut into Memphis society, and alcoholic beverages were served (though there is some testimony that this last did not meet with Mrs. Black's approval). I mention these things simply to say that the court believes that Hattie Boone complained about the fact that she didn't get to go to dances, attend the school that she wanted to attend, didn't get to make her debut, and other matters of a similar nature—just as I believe that Elizabeth wanted to attend Vassar—but I do not attach a great deal of significance to such testimony. I have seen too many cases where children think other brothers and sisters had 'all the best of it' in their home-life. At any rate, the Court does not feel that this 'griping,' 'nagging,' or 'bickering,' drove Mrs. Black to complete distraction, or caused her to execute the codicil in question against her wishes, and in order to be free from the displeasure of Hattie Boone.

"Contestant contends that Mrs. Black was completely under the will and domination of Hattie Boone, that her wishes were subservient to those of her eldest daughter, that Hattie Boone made all final decisions; in short, that the daughter could get her mother to do anything that she (Hattie Boone) wanted done.

"To discuss all the evidence at length would require more time than I care to devote to the matter, nor do I see that anything would be gained by such a discussion. The Court listened closely to all the witnesses, observed their demeanor, and particularly noticed those who seemed by their attitude, to take an undue interest in the case. Georgea Oliver McKinley, sister of the parties to this litigation, testified mainly as to matters that took place during childhood, or when she was living in the home; it was obvious (in fact admitted) that she held her eldest sister responsible for her own difficulties with her family, and her feeling became so strong at times that she was incoherent in her testimony. While she testified Hattie Boone could get her mother to do anything she wanted done, when pinned down, she could name only one or two examples.

: :"The testimony of various other witnesses sought to establish that Mrs. Black was very grieved over the death of her husband and the estrangement with her middle daughter; that she was as fully devoted to Elizabeth as to Hattie Boone, and that Hattie Boone dominated the family, and made the decisions. I consider it established that Mrs. Black was very grieved, and during the last months of her life, more so as to the estrangement with Georgea Oliver, than because of the death of her husband. There is certainly no evidence that she had anything against Elizabeth, and I conclude that she did love this daughter as she loved Hattie Boone. It definitely appears that Hattie Boone was also the dominating personality—in business affairs; that her decisions were generally the ones accepted in matters relating to business. I do not find this unusual. In every family, I am sure, one person's business judgment is looked upon by members of the family as being more reliable, either because of business ability, or because of business experience, and that particular one's opinion is generally given more weight in matters that arise for a decision. No one would dispute that Hattie Boone appears to have been the 'business member' of the family. In fact, the apparent difference between the nature of the girls was as striking to me as their dissimilarity in appearance. Hattie Boone has had more interest in operating Black enterprises, while Elizabeth would seem to have had more interest in 'things social.' During the early days after Mr. Black's death, it was necessary that someone 'take over,' and Mrs. Black in her grief, left those matters to Hattie Boone.

"But, I do not mean to say that all decisions, or even all business decisions, were made by Hattie Boone. The record discloses that Mrs. Black also transacted business, and she seems to have handled personal affairs pretty much as she saw fit. I refer to such as charities, Elizabeth's wedding, and the purchase of bonds.

"I believe the testimony of Mr. Pike, who testified that Mrs. Black refrained from burning an earlier will when Hattie Boone told her not to do so. This did not

strike me as a significant act of 'domination', as people are generally reluctant to destroy legal papers, though they have long ceased to be of any value, and even a suggestion that this not be done, might well be sufficient to prevent the act.

"When all is said and done, I cannot see that the evidence offered by Contestant even remotely comes close to proving necessary allegations, except for the testimony of one individual, Mr. J. W. Lorick. I see no reason to discuss this testimony, other than to say that a reading of the transcript will suffice to show that the Court could not give his evidence much weight. I am sure that even counsel for Contestant were startled when Mr. Lorick stated Mrs. Black was crazy, and it is difficult to understand as to why Mrs. Black would have confided in Mr. Lorick to an extent far greater than in people who were obviously a great deal closer (Mrs. Boyce and Mrs. Battle).

"In the main, witnesses for Respondent made a much better impression on the court than those for Contestant, due possibly to the fact, that from their manner of testifying, they appeared far more neutral in their feelings toward the two parties. I might say that I am convinced that Mrs. LaFargue is mistaken about the date of a particular conversion with Mrs. Black, which purportedly took place at a time when Mrs. Black, Mrs. LaFargue, and Mr. and Mrs. Dudley were riding in an automobile. I am convinced of this for two reasons; in the first place, according to her testimony, the alleged statement was made after Mrs. Black had executed the codicil, and I can see no reason for her (Mrs. Black) to make such a statement, knowing that she had done something entirely different. In the next place, Mrs. Dudley was a quite impressive witness, and convinced me that she would have heard any such conversation.

"Actually, the allegations made by Contestant, were given their strongest impetus by the testimony of Respondent herself. She was quite evasive in her answers, was evidently in fear that she would say something

wrong, there were discrepancies in her testimony, and I think some of her answers were incorrect. Still, the discrepancies and answers made that the Court did not accept as true, were not such as to weigh heavily in the final outcome of the case; nor did such answers raise doubt in my mind as to her veracity in the balance of her testimony. In the main, I think she testified truthfully.

"I have already commented that I felt she complained about the dances, schools, etc., and that I believed Mr. Pike's testimony (though she denied it). I might further state that I am thoroughly convinced that Mr. Clay Shilling went to the office of Mr. Gantt looking for a will, at the suggestion of Hattie Boone. (Though this was also denied).

"When a Court is called upon to decide a lawsuit, where frequently the testimony is in bitter conflict, it generally resolves the matter by considering the circumstances as well as the testimony. It may surprise counsel when I state that the circumstance above referred to, goes a long way toward convincing me that Hattie Boone did not know the contents of the codicil. I have no doubt that she was of the opinion, or at least considered it probable, that Mrs. Black had made some change in her will on the occasion of the visit to Mr. Gantt's office. I strongly believe, however, that if she had prevailed upon her mother to make this change, and accordingly knew the purpose for which her mother left her in the car and went up to his office, that she would have said nothing for some period of time following her mother's death. The will would have been found 'in due time', but the very eagerness with which she was seeking the will, not minding her sister knowing that she was anxious to find it, goes far to convince this court that she did not know what was in it. A normal person would be bound to realize that this eagerness to find a will which left everything to that individual, would naturally arouse suspicion in the minds of those who were left out.

"Counsel for Contestant make much of the fact that Hattie Boone and her Mother were together in a

hotel room in Memphis for several days prior to the execution of the codicil. This means absolutely nothing to me, as the two of them had lived in their home together for quite some period of time, and any undue influence exerted by Hattie Boone could certainly have been exercised as well at home as in Memphis.

"It is likewise significant to the Court that Elizabeth was invited to take the trip to Florida, and was called by Hattie Boone the night before the codicil was made. I cannot conceive of one who is plotting chicanery, inviting their adversary to be present on a long trip, when, at any time, Mrs. Black might let slip that such a codicil had been executed, or in remorse, have confided to Elizabeth as to what had been done.

"In my opinion, one of the principal witnesses in this cause was Mr. N. J. Gantt, Jr., the family attorney. Mr. Gantt testified that on many occasions, all three came to the office together, sometimes just Hattie Boone and her mother, and sometimes just Mrs. Black. He apparently noticed nothing unusual in the fact that Mrs. Black came to the office on this occasion by herself. He stated, in effect, that she appeared normal, capable, and seemed to know just what she wanted to do; in other words, that she was fully legally qualified to execute the codicil.

"It must be remembered that Mrs. Black spent several days in the home of Elizabeth, in Pine Bluff, during the last week of her life, while Hattie Boone was in Chicago, and accordingly had every opportunity to revoke the codicil, had she so desired. Really, out of all the testimony, there isn't one line of evidence anywhere in the record to the effect that Hattie Boone tried to get her mother to change her will. The court is asked to assume, that because Hattie Boone had the opportunity to exert undue influence, and because there was no obvious reason to favor one daughter over the other, that Hattie Boone did exert such influence.

"I might say I am sure all will agree, that had Elizabeth remained unmarried, in the home at DeWitt,

the will likely would not have been changed. This, of course, in itself, answers no questions.

"The Court has thought about this matter considerably and has pondered as to the reason for the making of the codicil.

"Contestant has emphasized Mrs. Black's grief the last few months of her life because of the breach with her daughter, Georgea Oliver. I consider this evidence as important, and perhaps enlightening; not, however, for the reason that Contestant emphasizes it. To me, it simply means that Mrs. Black was thinking constantly of her trouble with her middle daughter, and she undoubtedly placed the blame for this trouble on her son-in-law, Ed McKinley, Jr. I know nothing about the merits of that controversy, but Mrs. Black was evidently very bitter toward Mr. McKinley, and her remark in the presence of Mr. George Dunklin, a couple of nights before the wedding, strongly indicates that she was, even then, looking upon her new son-in-law to be with suspicion. I was interested in noting from a reading of the transcript, that Mr. Dunklin made no comment in his testimony about the blood transfusion that became necessary for his wife. It may have been that this was an oversight, but of the various alleged acts committed by Mr. Dunklin that might have proved irritating to Mrs. Black—this seemed to me to be the most important. Mr. Dunklin testified that he had never tried to 'run the Black business' and only suggested once that they get a general manager. I think Mr. Dunklin was sincere in this statement, though it did appear that he was having difficulty from the witness stand in restaining himself from criticizing their methods of operation. Be that as it may, I am simply saying that with the background of son-in-law trouble that Mrs. Black had, the explanation of the codicil, may not be too remote. There was also some evidence that Hattie Boone had made a will leaving everything to Elizabeth at her death; that Mrs. Black knew about such will. This could have strengthened her decision to keep Black property solely in the Black family, but now the Court is doing what the attorneys

have been doing; that is, surmising as to the reason for the change of mind.

"A Court cannot base its decisions on surmise or speculation; only the evidence adduced can be considered. There is no evidence in this lawsuit that would establish undue influence. This is no case of a stranger inheriting to the exclusion of natural and loved relatives; here, a daughter, loved, and respected for her ability, is the beneficiary. This is no case of the one being given everything, and the other left destitute and penniless. The evidence shows that in addition to a marriage in a family whose finances are 'substantial' (Elizabeth's expression) and exclusive of her rights in the L. A. Black estate, that Elizabeth has an annual income of over $50,000.00.

"There is, of course, a natural tendency with a Court, because we are human beings, to believe in what we consider 'equitable distribution'. We tend to feel that it would be fairer for all to share equally — but such feelings cannot be considered in reaching our conclusions and decision.

"As stated at the outset, Mrs. Black had a perfect right to dispose of all that belonged to her, in the manner that she saw fit, to express her will as to what should happen to her property after her demise. A study of the testimony convinces me that it was 'her will', arrived at by her own mental processes, and for reasons known, absolutely, only to her".

The Judgment of the Probate Court is affirmed.

JUSTICE GEORGE ROSE SMITH, not participating.