ROSENBAUM *v.* CAHN.

5-2538                                    351 S. W. 2d 857

Opinion delivered December 11, 1961.

*Cockrill, Laser & McGehee* and *Floyd, Cameron & Deen,* Meridian Miss., for appellant.

*Wood, Chesnutt & Smith* and *House, Holmes, Butler & Jewell* and *Gaillard Pitts,* Meridian, Miss., for appellee.

CARLETON HARRIS, Chief Justice.    This is a will contest.    Carrye Rosenbaum Burgauer, age 79, died on September 18, 1959, exactly four months and one day after the death of her husband, David Burgauer, leaving a will naming her sister, Mrs. Ruth Cahn, and her nephew, A. L. Cahn (son of Ruth Cahn), as principal beneficiaries. The Burgauers were childless. A petition contesting the will was filed by Willard L. Rosenbaum, S. A. Rosenbaum, and Mrs. Pauline R. Korman. Willard  Rosenbaum was a brother of Mrs. Burgauer, and

S. A. Rosenbaum and Mrs. Korman are the children of a brother who predeceased the testatrix. These appellants were left no property under the provisions of the will.[1] On hearing, the court dismissed with prejudice the petition and complaint contesting the probate of the will, and confirmed its order earlier entered, wherein the will of Mrs. Burgauer, dated July 18, 1959, was admitted to probate. From this judgment, appellants bring this appeal. For reversal, appellants rely upon two points, vis., "The trial court erred in ruling that the proffered will was not the product of undue influence", and "The purported will was not attested by two or more credible, competent, and disinterested witnesses as required by law."

This is quite an unusual case in one respect, in that it is contended that Mrs. Burgauer was subjected to undue influence from two different persons, though these people, as far as the proof relied upon by appellants is concerned, acted entirely independently of each other. They were not related, were not good friends, and had no apparent common interest. Appellants admit they are unable to establish any connection. The alleged users of undue influence are Marie Schnebelen, co-executor of the will, and a beneficiary to the extent of $1,000, and Mrs. Ruth Cahn, sister, and a principal beneficiary. Miss Schnebelen is trust officer of the Arkansas Trust Company, and had served as Mr. Burgauer's personal secretary for thirty years.[2] She, of course, was well and favorably known to Mrs. Burgauer. Mr. Burgauer died on May 17, 1959, but his will was not read until June 6th. The will was read at his home, and as Mr. Cooper Land, attorney for the estate, and Miss Schnebelen left the home, the latter asked Mrs. Burgauer if she did not

---

[1] Item seventeen provided: "I am giving no material legacy, but love and affection, to my brother, Willard Rosenbaum, my nephew, Sy Rosenbaum, both of Meridian, Mississippi, and my niece, Pauline Korman, of Teaneck, New Jersey, nor the members of the family of my deceased brother, Marx Rosenbaum, as I realize they are well endowed with material possessions. This token of affection is an expression of my love for them."

[2] David Burgauer, in his lifetime, was president of the Arkansas Trust Company.

think she should execute a will. Approximately two weeks later, Mrs. Burgauer asked Miss Schnebelen to bring Mr. Land to the home the following day for discussion of terms of the will. At the time of that visit, Miss Schnebelen took notes on the information furnished, in the presence of Mr. Land, and she subsequently gave to the attorney a typewritten summary. A few days later, according to the testimony of Miss Schnebelen, Mrs. Burgauer phoned and stated she had additional data to be furnished the lawyer, and the witness noticed Mrs. Burgauer had not appointed an executor or an attorney, and asked if the latter desired to do so. The response was that Wootten, Land & Matthews, handling the estate of her deceased husband, should be named. The witness went to the Burgauer residence, and at that time, Mrs. Cahn, who had stayed with her sister since Mr. Burgauer's death, was still in the home. Miss Schnebelen testified that she started reading the summary of bequests which Mrs. Burgauer had previously given her, and appellee got up to leave the room; when she read a bequest to Mrs. Cahn in the amount of $15,000, the testatrix directed that she make it $25,000, and she heard Mrs. Cahn give a sigh as she went out the door.[3] This is the only instance in regard to the will where Mrs. Cahn and Miss Schnebelen came into contact.

Appellants contend that Miss Schnebelen occupied a position of trust and confidence as the business advisor of Mrs. Burgauer; in other words, she stood in a fiduciary capacity, and under our holding in *Orr* v. *Love,* 225 Ark. 505, 283 S. W. 2nd 667, the burden of proof was upon the proponents to establish the validity of the proffered will; *i.e.,* the instrument was executed voluntarily and free of undue influence. The language relied upon from that case is as follows:

"Where the beneficiary plans the will and causes it to be executed, the same rule applies as where he drew the will."

---

[3] This remark certainly would not indicate any fraudulent conspiracy, for the statement would not be calculated to help Mrs. Cahn.

Further:

"When a will is written or proved to be written by a person benefiting by it, or by one standing in the relation of attorney or counsel and is also benefited by it—these are circumstances to excite stricter scrutiny and require stricter proof of volution and agency."

We do not agree that that case or language has any application herein. An examination of the case reflects many differences from the one at bar. For one thing, in the *Orr* case, Mrs. Love was one of the principal beneficiaries; for another, the will was actually executed under the instructions of that beneficiary; for another, Mrs. Love was present when the will was executed; for another, the testatrix had previously made a will prepared by her own lawyer, but the will in question was prepared by the beneficiary's lawyer. Numerous other examples could be given, but these will suffice to show the difference in the circumstances surrounding the making of the wills.

Appellants' contention is based on the argument that Mrs. Burgauer had handled but few business matters, had reached an advanced age, was dependent for business advice, and was suffering at the time from extreme grief due to the passing of her husband. It is pointed out that the suggestion for a will was made by Miss Schenebelen, but, under the circumstances, we do not find this strange or unusual. Miss Schnebelen had, as previously stated, been closely associated with Mr. Burgauer during his lifetime for thirty years, and it would seem natural for one, whose daily business activities were connected with estates, to make such a suggestion to one who, according to appellants, was in need of business advice. Certainly, the suggestion of making a will is normally good advice. Appellants point out that the will named Miss Schnebelen as a specific legatee, but they emphasize the fact that she was named co-executor. From the brief:

"Examining the proof, it appears that Miss Schnebelen, with justification, anticipated a substantial exe-

cutor's fee. At the time the initial inventory of the estate was prepared and filed, it reflected as assets, in addition to the personal estate of Mrs. Burgauer, which exceeded a quarter of a million dollars, the entire estate of David Burgauer on the theory that his property became a part of her estate by reason of the exercise of the power of appointment in her will. The inventory as thus filed, reflected an estate subject to the statutory executor's fee well in excess of a million dollars. Simple arithmetic shows that the executors reasonably could expect a fee of approximately $35,000.''[4]

It seems logical that if Miss Schnebelen was contemplating chicanery, and was in a position to overreach Mrs. Burgauer, she would not have settled for a thousand dollar legacy and a co-executorship, leaving a vast estate to people that she hardly knew. After all, there is not any showing that Miss Schnebelen even asked to be named co-executor. Nor do we find anything unusual in the fact that Mrs. Burgauer did name Miss Schnebelen to act in that capacity, and named the latter as beneficiary of a bequest of $1,000. What was more natural than for Mrs. Burgauer to name her husband's bank and his secretary as her co-executors, particularly when the latter had, as she knew, during Mr. Burgauer's lifetime, assisted in matters relating to Mrs. Burgauer's properties? Mr. Burgauer himself had demonstrated his affection for his long time secretary by leaving Miss Schnebelen $2,500 in his will, a fact well known to his widow. Appellants make mention of the fact that Miss Schnebelen, soon after the death of Mrs. Burgauer, when questioned by some of the contestants, denied that she had suggested that the will be made, but had stated instead that the suggestion had come from the attorney.

---

[4] Mr. Burgauer, in his will, left the greater portion of his estate to his wife for life, with the power of appointment by will, naming, in the event she failed to exercise that power, certain beneficiaries who were to receive the remainder. Mrs. Burgauer did exercise the appointment, naming the same beneficiaries as set forth in Mr. Burgauer's will, apparently not knowing that his beneficiaries would receive the properties if she did not exercise the power. Subsequently, it was determined by the attorneys for the estate that the David Burgauer properties did not merge in the Carrye Burgauer estate.

Miss Schnebelen testified that her reason for doing this was simply a matter of trying to avoid a contest of the will, and she thought if she told that the attorney advised it, the contestants would be discouraged from instituting the litigation. This is the only "off-color" act of Miss Schnebelen in the entire matter, and certainly, it is insufficient to establish undue influence. It is very evident from the proof that Miss Schnebelen did not plan the will; rather, the evidence shows that all items were furnished by the testatrix;[5] nor was the will written by Miss Schnebelen; neither was she a principal beneficiary—and she was not present when the will was executed. As previously stated, this case does not fall within the category of the holding in *Orr* v. *Love, supra*.

The principal target of appellants' contest is Mrs. Cahn. The proof upon the part of appellants is as follows. Mrs. Floy Faulkner, a resident of Hot Springs, was called into the Burgauer home as a nurse during Mr. Burgauer's last illness. Following his death, she stayed on as a companion to Mrs. Burgauer, until the latter's death. Mrs. Faulkner testified that Mrs. Burgauer was terribly grief stricken, and despondent, following the death of her husband; that she cried each day, or talked about his passing; she would go to the cemetery every day except Saturday, stating that she felt closer to him there than at any other place; according to the witness, at the cemetery she would stand, cry, talk, and wonder how she was going to go on without him; a chair was taken to the cemetery and Mrs. Burgauer would sit for long periods of time.

The following testimony by this witness is relied upon by appellants as indicating undue influence exerted upon the testatrix: (a) She heard Mrs. Cahn tell her sister that "Dave made his will like he wanted it, and it's time that you do something about yours." (b) When the witness and Mrs. Burgauer visited relatives in Meridian, Mississippi (home of Mrs. Cahn), in August, Mrs.

---

[5] The will contains twenty-one items, including specific bequests (to be paid from Mrs. Baugauer's estate) to fourteen different people, and one hospital association.

Burgauer took a copy of her will to Meridian to show her sister. (c) The testatrix had told her that Mrs. Cahn had said that Mr. S. A. Rosenbaum and Pauline Korman, the nephew and niece "had plenty, and they didn't need anything." (d) While in Mississippi, Mrs. Burgauer stated to her (Mrs. Faulkner) that she wanted all of her relatives to share alike. (e) In Meridian, Mrs. Burgauer purchased a sweater for the witness' granddaughter from a store operated by people Mrs. Cahn did not like, and the testatrix told the witness not to say anything to her sister about it—that Mrs. Cahn would not approve. (f) While in Meridian, Mrs. Burgauer had shown the witness her jewelry, and stated that Mrs. Cahn had plenty of jewelry, "quite a bit that she didn't wear" and "She felt like that Mrs. Cahn had sufficient without hers,  *  *  *  and she said, 'there's you and Marie, you and Miss Marie don't have any jewelry,' and she said, 'I could give you some of it.' I didn't reply in any way because I felt like it was just conversation, she just wanted to talk.'"[6] (g) The day before her death, Mrs. Burgauer told the witness that she was going to change her will; that Miss Schnebelen would be there on Sunday night for dinner, and she would talk to her at that time.[7] On cross-examination, Mrs. Faulkner did state that Mrs. Cahn and Mrs. Burgauer seemed to be devoted to each other.

With the exception of Dr. Francis J. Scully, who apparently was called during the trial for the purpose of endeavoring to establish mental incompetency on the part of Mrs. Burgauer,[8] the remaining proof on behalf of appellants was offered by two of the contestants, S. A. Rosenbaum and Willard Rosenbaum. The former, 45 years of age, is a nephew, and resides in Meridian, Mississippi. He testified that he had, throughout the years, visited in Mrs. Burgauer's home numerous times, probably once or twice per year. He is the father of two

---

[6] Under the will, Mrs. Cahn received the Burgauer jeweler.

[7] Mrs. Burgauer died on Friday.

[8] Dr. Scully stated that Mrs. Burgauer was much grief stricken, probably more so than the average person, but he did not believe her husband's passing affected her mental capacity.

little girls, who were left $500 each in the decedent's will. He testified that he had, for a number of years, looked after Mrs. Burgauer's business interests in Mississippi, though he always corresponded and discussed these business matters with Mr. Burgauer. The deceased, in her lifetime, was interested in partnerships and other business ventures in that state, including the Rosenbaum Realty Company, which was owned by the estate of Mrs. Burgauer, Mrs. Cahn, and Willard L. Rosenbaum. S. A. Rosenbaum's mother has a life interest in the property, and the same is managed by the witness. Mr. Rosenbaum contended that Mrs. Burgauer was subject to the influence of her sister, to whom she had been very fond. Instances that he stated occurred and indicated undue influence were as follows:

(a) In negotiating a lease with Woolworths for space in the Rosenbaum building, it became necessary to make improvements in the amount of approximately $250,000. All parties signed the lease, but Mrs. Burgauer did not want to sign the note to the bank. Mrs. Cahn told Mrs. Burgauer that she should sign with the other members of the family, and her sister did so.

(b) An employee, who had worked for both Mrs. Cahn and her mother for many years, was retired, and given a pension of $20 per month. Mrs. Cahn insisted that this amount should be paid by the realty company. The father of the witness and Willard Rosenbaum did not feel it to be their obligation, but agreed, to avoid argument with Mrs. Cahn. The latter persuaded Mrs. Burgauer that it should be handled in that manner.

(c) According to the witness, about a year or two before the death of his father, Mrs. Cahn showed the father a check, purported to be signed by her mother, in the amount of $5,000, dated some years before, which Mrs. Cahn had never cashed. Mrs. Cahn wanted the Rosenbaum Realty Company to pay the check. The two Rosenbaum brothers refused to honor the check, though Mrs. Burgauer was of the opinion that Mrs. Cahn ought to be paid the money, and ''she wrote my Father urging

him to pay his part of the money to Mrs. Cahn on this check. My Father and Willard did not pay it.'' According to this appellant, while he and his Uncle Willard were in the Burgauer home awaiting the funeral, A. L. Cahn came into the bedroom, and informed him that the witness' father had promised to leave Cahn's mother $25,000, and that Charles Rosenbaum, an uncle of S. A., had promised to leave her $10,000, but neither had made the bequests. A. L. Cahn then remarked, ''Now Aunt Carrye is going to rectify all that and I just want you to understand it.''

(d) Mrs. Burgauer told him during his father's lifetime that upon her death, everything would go to Mr. Burgauer for life, and the remaining estate would go equally to his father, Mr. Willard Rosenbaum, and Mrs. Cahn.

Rosenbaum testified that Mrs. Burgauer made trips to Meridian from time to time, and always stayed in the home of Mrs. Cahn, but visited his home for dinners and family gatherings. He stated his net worth to be approximately $347,000.

The deposition of Willard Rosenbaum, brother of decedent, 78 years of age, was taken. Mr. Rosenbaum reiterated the matters set out in his nephew's testimony, and said that his sister was a high tempered woman, quite dictatorial, and was always trying to ''beg somebody out of something or hog something. That's been her nature.'' He stated that from his observation of Mrs. Burgauer (melancholy, nervous, and upset), she was not in any mental condition to make a last will and testament. Finally, he testified relative to a purported telephone conversation with Mrs. Cahn that took place in October, 1959.

''It was the latter part of October after we come back from over there in October, and she says, 'I understand you have been to Hot Springs and you're dissatisfied with Carrye's will.' That's Mrs. Burgauer. I says, 'Yes, I have been to Hot Springs, and I am dissatisfied with it.' She says, 'Well, it took me a long time to put it

over but I finally made it. None of you gave me credit for having as much sense as I have got.' I says, 'Have you got anything else to say?' and she says, 'No.' And I hung up, and that's exactly what she said.''

The witness estimated his net worth at $300,000.

We turn now to the proof on behalf of appellee. Cooper B. Land,[9] prominent attorney of Hot Springs, and who had served as Mr. Burgauer's attorney, testified that he prepared Mrs. Burgauer's will in the early part of July, 1959, and that she executed the will at her home on July 18th. He went to her home, together with Oscar Luebben, a certified public accountant, who had done tax work for Mr. and Mrs. Burgauer, primarily relating to her interests in partnerships and joint ventures in Mississippi. The attorney stated that they were admitted to the Burgauer home by Mrs. Gabe Meyer of Pine Bluff; he did not recall that any other person was in the home, and Mrs. Meyer was not in the room when the will was signed. According to his testimony, the terms of the will were discussed, and Mrs. Burgauer then signed the will in their presence and they witnessed same at her request. Mr. Land testified that from his dealings with Mrs. Burgauer, he would state that she had the capacity to retain in memory, without prompting, the extent and condition of her property, to comprehend to whom she was giving it, and to comprehend who was being excluded. Mr. Land had previously, on June 20th, discussed with Mrs. Burgauer the provisions to be placed in the will. He stated that on that occasion she appeared normal, although she was suffering grief from her husband's death.

Mr. Luebben verified Mr. Land's testimony relative to the execution of the will.

Mrs. Doris Cohen, a resident of Little Rock for approximately thirty-two years, and a niece of Mr. Burgauer, stated that she had visited in the Burgauer home, probably as often as every other week, for her entire

---

[9] Mr. Land properly withdrew from representation of the estate in this litigation.

life. Following Mr. Burgauer's death, she and her husband would go to Hot Springs to the home every other weekend, and would alternate with the Gabe Meyers of Pine Bluff. The witness testified that although Mrs. Burgauer was very sad, she did not observe any drastic change in the latter's outlook toward life. She was of the opinion that Mrs. Burgauer was entirely capable of knowing the extent of her properties and to know to whom she was giving it, and she did not feel that Mrs. Burgauer was dominated by Mrs. Cahn. She testified that her aunt was not easily influenced. Her husband, Louis Cohen, concurred in his wife's testimony.

Mr. Gabe Meyer, nephew of Mr. Burgauer, testified that over the years, he had visited in the Burgauer home about once a month until his uncle's illness, and he then visited every week or so. He stated that he had looked upon Mrs. Burgauer as a mother from the time that his own mother passed away in 1944. The witness noticed no change in his aunt after Mr. Burgauer's death, other than grief. He considered her very alert, and capable of making her own decisions. Mr. Meyer's wife testified that she saw Mrs. Burgauer frequently following the death of Mr. Burgauer, and alternated with Mrs. Cohen in staying with her. Mrs. Burgauer spent one week in Pine Bluff with the Meyers, and requested the latter couple to invite some friends of Mrs. Burgauer (who lived in Pine Bluff) to the Meyers' home so she could visit with them. Witness stated she was present in the Burgauer home when Mr. Land and Mr. Luebben came to the house; that Mrs. Burgauer had told her she was expecting the two on a business matter. Mrs. Meyer left the room, and subsequently her aunt called her, and asked her to come in, as the men were leaving. She said that Mrs. Burgauer seemed to be in very good spirits, and after Mr. Land and Mr. Luebben had left, made the remark that she was glad the matter was taken care of. Mrs. Cahn was not present at that time, having already returned to Meridian. Mrs. Meyer stated that she never noticed any evidence of domination by Mrs. Cahn over

Mrs. Burgauer, and actually always felt Mrs. Cahn was very retiring in nature.

Norton Meek, banker with the Arkansas Trust Company, related several business matters with Mrs. Burgauer before Mr. Burgauer's death, and stated that he saw no change after her husband's death except for normal grief at his passing.

Cecil Cupp, president of Arkansas Trust Company, knew both Mr. and Mrs. Burgauer socially, and in a business way. He testified that he saw her at least a dozen times after Mr. Burgauer's death, and noticed no change in her personality or ability.

Mrs. Fannie McLaughlin, administrator of the Levi Hospital Nurses Home in Hot Springs, stated she had known both Mr. and Mrs. Burgauer as long as she could remember. Mr. Burgauer had served as treasurer of the hospital, beginning with its inception in 1914. She related the kindnesses of Mrs. Burgauer when her (Mrs. McLaughlin's) husband was ill. She testified that she talked with Mrs. Burgauer over the telephone almost daily after Mr. Burgauer's death, except for the periods when Mrs. Burgauer was visiting in Meridian. She noticed no change in her friend except that she was very grief stricken. Based on her close association, she was of the opinion that Mrs. Burgauer made her own decisions, and mentioned instances during Mr. Burgauer's lifetime when his wife made decisions contrary to her husband's ideas. The witness visited in the home while Mrs. Cahn was staying there, and stated that she had never observed any domination of Mrs. Burgauer by her sister. In fact, it was her opinion that Mrs. Burgauer possessed the more dominant personality of the two.

Both A. L. Cahn and his mother testified, but we see no point in detailing the testimony. Mr. Cahn testified that he knew nothing about the contents of the will until he heard it read. He testified that he had always been very close to his aunt, and she had been quite fond of his daughter, Melanie Renee Cahn, to whom she left the sum of $1,000. His net worth was estimated at approxi-

mately $300,000. Mrs. Cahn, 74 years of age, had been a widow since 1924, her husband dying at the time her son was one and one-half years old. After Mr. Burgauer's death, she stayed in the home of her sister until June 18th, at which time she returned to Meridian, and remained there until Mrs. Burgauer's death. She denied discussing with her sister the disposition of the latter's property, other than a discussion in 1951 with Mrs. Burgauer about a fur cape. She testified that she did not know the financial condition of the appellants until she heard it mentioned in the testimony of the case, and estimated her own net worth at 104,000.

We are of the opinion that the weight of the evidence definitely preponderates in favor of appellees, though for the appellants to prevail, the preponderance would have to be contrariwise. Most of the incidents relied upon by appellants are rather meaningless. Certainly, it is not out of the ordinary for sisters to advise with each other, and all witnesses agreed that these two sisters had been very close throughout the years. We think it noticeable that on Mrs. Burgauer's visits to Meridian, she always stayed with her sister, rather than with the other relatives. This, in itself, indicated a preference for Mrs. Cahn, and a stronger affection for the sister, than for the appellants who were residing there.

All persons are influenced to some degree by the opinions of those to whom they are devoted, but as was stated as far back as 1887, in *McCulloch* v. *Campbell,* 49 Ark. 367; 5 S. W. 590:

"As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties. It is not sufficient that

the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

This statement of the law has been reiterated in numerous cases since that time. In some respects, this litigation is similar to that of *Dunklin* v. *Black*, 224 Ark. 528, 275 S. W 2d 447. There, the elder daughter was left the vast bulk of her mother's estate, practically to the exclusion of a younger daughter, and it was contended that Mrs. Black was not accustomed to handling business, and since she was suffering extreme grief because of the death of her husband, was easily subjected to the undue influence of the elder daughter. We held that undue influence was not established. In the case before us, appellants point out that during the thirty days Mrs. Cahn stayed at the Burgauer home (following Mr. Burgauer's death) she had every opportunity to overpersuade her sister in the disposition of her property, but in the*Black* case, the mother and the favored daughter *lived* together, which, of course, gave daily opportunity. We are not, after all, concerned with the *opportunities* to exert undue influence; for that matter, if one connives, the opportunity can generally be afforded.

It might be here mentioned that there was evidence that Mrs. Burgauer, prior to executing the will in litigation, had executed a previous will in 1949, leaving her entire estate to her husband. On July 11, 1957, Mrs. Burgauer signed a typed letter addressed to her husband asking, in event that she should die first, that he immediately make a new will leaving all that portion of her estate "which you may still have at the time of your death" in the manner set forth in the letter. The disposition mentioned therein was very similar to the disposition in the present will of Mrs. Burgauer, including the naming of Mrs. Cahn and her son as residuary legatees, and the failure to leave any property to appellants herein. This letter was excluded by the court, but, if inadmissible as affirmative evidence to show Mrs. Burgauer's testamentary intent at a time when there

could be no claim of undue influence, it was clearly admissible to rebut the testimony of S. A. Rosenbaum, who testified that Mrs. Burgauer had told him her remaining estate would go equally to his father, Willard Rosenbaum, and Mrs. Cahn.

In the case before us, Mrs. Cahn was not in the Burgauer home, and had not been there for a month, when the will was executed; rather, she was in Meridian, Mississippi. Undue influence would have been indeed difficult to exert at that distance. We think the evidence was particularly strong that Mrs. Burgauer was clearly capable of knowing the parties to whom she left bequests—and the parties whom she excluded from her estate. This was established by persons who had no pecuniary interest in the result of this litigation.

In *Dunklin* v. *Black, supra,* we stated:

"This is no case of a stranger inheriting to the exclusion of natural and loved relatives; here, a daughter, loved, and respected for her ability, is the beneficiary. This is no case of the one being given everything, and the other left destitute and penniless. The evidence shows that in addition to a marriage in a family whose finances are 'substantial' (Elizabeth's expression) and exclusive of her rights in the L. A. Black estate, that Elizabeth has an annual income of over $50,000.00."

The same reasoning applies here. No one has been left penniless or destitute by Mrs. Burgauer's action. All parties are independently wealthy. Members of the family were not "cut-off" in favor of strangers; here, a widowed sister, loved and respected throughout the years, and her only son, are the principal beneficiaries. We are not concerned with Mrs. Burgauer's reasons for the manner of the testamentary disposition. She had every right to dispose of her property as she saw fit, and a study of the testimony convinces us that the instrument was, as stated in *Dunklin* v. *Black, supra*:

"* * * her will, arrived at by her own mental processes, and for reasons known, absolutely, only to her."

We turn now to appellants' contention that the will was not attested by two or more credible, competent, and disinterested witnesses as required by law. This contention is directed to the fact that Mr. Cooper Land, named as one of the attorneys for the estate, witnessed the execution of the will, along with Oscar Luebben. Appellants contend that Mr. Land was incompetent and incapable as a matter of law in acting as an attesting witness because he had a material personal interest under the provisions of the will. This is a reference to the fact that the law firm with which he is associated was named to represent the estate. Likewise, they contend that Mr. Luebben was not a competent and disinterested witness, pointing out that he was already employed to handle tax matters in the David Burgauer estate, and, "At the time of execution of the will, Mr. Luebben had immediate expectation of being employed also in Mrs. Burgauer's estate to render accounting and tax services." Of course, Mr. Luebben was not mentioned in the will in any manner. Section 60-402, Ark. Stats., deals with the qualifications of an attesting witness to a will. Subsection (c) provides: "No attesting witness is interested unless the will gives to him some beneficial interest by way of devise." In being appointed attorney for the estate, Mr. Land was not a legatee or devisee, *i.e.,* he was not *given* anything. As appellees point out, attorneys are generally pleased to accept such employment in order to earn a fee—but they will *earn* the fee Section 62-2003 defines "devise" as "disposition of real or personal property, or both, by will." Actually, this Court had previously expressed itself in the case of *Fontaine* v. *Fontaine,* 169 Ark. 1077, 277 S. W. 867. The question in that case was whether an executor of an estate is a competent attesting witness to the will.

We said:

"The general rule established by the authorities is that an executor of a will is competent as a subscribing witness to its execution (citing cases from other states). Our statute does not change the general rule, for the word 'appointment' used therein necessarily refers to

some appointment coupled with a beneficial interest. All the benefits which accrue to an executor on his appointment are derived from the statute prescribing the fees, and not by way of a gift or bequest under the will. In other words, the interest which an executor has in the appointment is indirect, and he has no interest within the meaning of the statute prescribing the qualifications of witnesses."

Of course, the Probate Code was enacted subsequent to that decision, but we think the Legislature clearly expressed itself by declaring that an attesting witness is not interested unless he receives a beneficial interest by way of devise.

Affirmed.