Trotter said she was unaware that she was a beneficiary, but the medical notes indicated that Jelinek did inform Trotter that she would be the beneficiary of his will. Jelinek was transferred to a hospice facility on February 9, and he died on February 19, 2017.
Trotter informed Satterfield of Jelinek's death, and the will was read to Trotter and Wood. Trotter was the primary beneficiary of the will, receiving Jelinek's house in Little Rock and the residue of his entire estate including a family trust. Jelinek made other specific bequests to friends, neighbors, his mother's caretakers, and the caretakers' church, none of whom had any relationship to Trotter.[2] Trotter filed a petition to probate the will and appoint herself as administratrix on March 8, 2017, and it was admitted and approved in an order filed on March 9, 2017.
In May 2017, Gustin, one of Jelinek's two surviving first cousins, filed a petition to set aside the order admitting the will to probate. Gustin argued that Trotter (1) had procured the will and (2) had exercised undue influence over Jelinek prior to his hospitalization, given his ill health and her short-term-but-close relationship with him. There was no contention that Jelinek lacked capacity to execute the will because he was sharp and alert up until his death, and Gustin conceded that there was no undue influence exerted on February 6, 2017, the date the will was created and executed.
Gustin had not seen Jelinek since 1976, although she claimed that she and Jelinek grew up in a close-knit Catholic family. Gustin lived out of state and had not visited Jelinek, but she said that she kept in touch with cards, letters, and texts. Jelinek's mother had died in 2015, and Gustin was a beneficiary of her will, but Gustin did not attend her funeral because she did not learn of her death until after the fact. Gustin said that Jelinek had written to her about his mother's death and had written down his cell phone number. Gustin believed that Jelinek was an alcoholic and that he smoked marijuana all the time; he had told her of two DWIs. Gustin contended *160 that Trotter had taken advantage of her short friendship with a very-ill Jelinek.
Trotter agreed that Jelinek had received a Christmas card that year from Gustin but that he never had very positive things to say about her. Trotter noted that Jelinek had changed cell phones when he moved from Texas to Arkansas, so if Gustin used the Texas phone number, he never got those messages. Trotter said that she (Trotter) was like a daughter to Jelinek. Trotter stated that she did not have Gustin's contact information to give to the attorney when Jelinek died. Trotter explained who the individuals were who received specific monetary bequests from Jelinek, and she remembered that Jelinek went with his mother's caretakers to their Baptist church a couple of times even though he was Catholic.
The probate court ultimately found that there was no procurement, which Gustin does not contest on appeal. The probate court found that Trotter did not exercise undue influence over the decedent prior to his hospitalization, stating that Gustin had failed to present any evidence of physical coercion exerted against Jelinek or any fear exhibited by Jelinek. The probate court acknowledged that Trotter's friendship with Jelinek less than a year before his death and her having moved into his house mere months prior to his hospitalization and death could be considered suspicious circumstances. The probate court found, however, that the evidence showed Jelinek was never in a weakened mental state up until his death, and Gustin had failed to present any evidence to indicate otherwise leading up to his hospitalization. The probate court found that despite Gustin's claim that she and Jelinek were close, there was "no real, positive relationship" between them, so it was "not impossible, therefore, that Mr. Jelinek would draft a will providing for those that he was close to in his last days as opposed to distant relatives." The probate court decided that on the totality of the circumstances, "there is no indication that Ms. Trotter took any steps to overcome Mr. Jelinek's free will" and that there was no evidence of undue influence in the time leading up to the will's execution. Gustin's appeal followed.
Arkansas caselaw related to undue influence is as follows. The party contesting the validity of the will has the burden of proving by a preponderance of the evidence that the testator lacked mental capacity at the time the will was executed or that the testator acted under undue influence. Looney v. Estate of Wade , 310 Ark. 708, 839 S.W.2d 531 (1992). The existence of a confidential relationship between a primary beneficiary and a testator gives rise to a rebuttable presumption of undue influence. Simpson v. Simpson , 2014 Ark. App. 80, 432 S.W.3d 66. A confidential relationship arises between a person who holds power of attorney and the grantor of that power. Darr , supra.
The questions of mental competency and undue influence are so closely related and interwoven that we consider them together. Sullivant v. Sullivant , 236 Ark. 95, 364 S.W.2d 665 (1963). In a case in which the mind of the testator is strong and alert, the facts constituting undue influence would be required to be far stronger than a case in which the mind of the testator was impaired, such as by disease or advancing age. Short v. Stephenson , 238 Ark. 1048, 386 S.W.2d 501 (1965). Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. Id. Undue influence is defined as not the legitimate influence which springs from natural affection but the malign influence that results from fear, coercion, *161 or any other cause that deprives the testator of his free agency in the disposition of his property. Darr , supra. Undue influence may be inferred from the facts and circumstances of a case, and cases involving questions of undue influence will frequently depend on a determination of witness credibility. Id. A testator has the legal right to dispose of his or her property in any manner that he or she sees fit, even if the disposition might appear on its face to be unnatural or inequitable, so long as such disposition expresses the will of the testator. Dunklin v. Black , 224 Ark. 528, 275 S.W.2d 447 (1955) ; Breckenridge v. Breckenridge , 2010 Ark. App. 277, 375 S.W.3d 651.
In this case, Gustin conceded that the testator possessed testamentary capacity at the time he executed his will, and Gustin does not contest the probate court's finding that Trotter did not procure the will. Thus, we are limited to reviewing the finding that the testator was not subjected to undue influence in the time leading up to the testator's hospitalization. Trotter clearly had a confidential relationship with the testator due to her having his power of attorney, giving rise to a rebuttable presumption of undue influence. Nonetheless, we see no clear error in the probate court's order. On de novo review, it is clear that, based on the weight of the evidence and the credibility determinations made by the probate court, Trotter effectively rebutted the presumption of undue influence.
Jelinek gave bequests to friends who were important to him and to a church he had attended, and he gave the remainder to Trotter, who had cared for him in the months leading up to his death. A testator's decision to favor a person with whom he had developed a close and affectionate relationship is not, of itself, proof that the favored beneficiary procured the will by undue influence. Hodges v. Cannon , 68 Ark. App. 170, 5 S.W.3d 89 (1999). The issue of undue influence will frequently depend on the credibility of witnesses, and we give due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. See Pyle v. Sayers , 344 Ark. 354, 39 S.W.3d 774 (2001). Jelinek was a widower with no children. Jelinek formed a close friendship with Trotter and entrusted her with his power of attorney. Jelinek relied on Trotter to provide him with personal care and transportation and to run his household. The probate court found that he did not have a close relationship with his cousin Gustin, whom he had not seen since 1976 and with whom he had limited contact. Jelinek was competent, despite his illnesses, to decide the disposition of his estate. After our de novo review of the evidence in this case, we are not convinced that the probate court clearly erred in rejecting Gustin's claim of undue influence and in denying Gustin's motion to set aside the will.
Affirmed.
Gruber, C.J., and Vaught, J., agree.

Jelinek gave $5000 to Tamela Washington (his mother's caretaker), $5000 to Portia Washington (his mother's caretaker), $2000 to Janet Murphy (his friend), $1000 to Jim Eager (his neighbor), $1000 to Jan Eager (his neighbor), and $10,000 to New Bethel Baptist Church in Little Rock (Tamela and Portia Washington's church).