ALLISON *v.* STROH.

5-2071                                                  333 S. W. 2d 737

Opinion delivered March 21, 1960.

[Rehearing denied April 25, 1960]

*Festus O.. Butt,* for appellant.

*C. A. Fuller, Virgil Roach Moncrief* and *John W. Moncrief,* for appellee.

GEORGE ROSE SMITH, J. This is a will contest. The testator, Perry O. Bellville, a resident of Eureka Springs, died February 24, 1958, at the age of 87. His will had been executed four years earlier, on March 27, 1954. Bellville was survived by two daughters, the appellant Vera Allison and the appellee Wanda Stroh. Mrs. Stroh contested her father's will on the ground of undue influence. The probate judge set the will aside, and the only question is whether his decision is against the preponderance of the evidence. *Evans* v. *Sawyer,* 228 Ark. 551, 309 S. W. 2d 25.

Many years ago Bellville came to Arkansas from Illinois and settled near Stuttgart, purchasing a 220-acre farm in Prairie county. Sometime in the 1930's Bellville and his wife moved to Eureka Springs, but the two daughters, who were both grown and married, continued to live in Arkansas county, at Stuttgart and De-Witt. Mrs. Allison, the younger sister, owned and operated a women's clothing store at Stuttgart for twelve years or more. In the early 1950's she and Mrs. Stroh ran a similar store together in DeWitt for about two years, but the venture was not profitable. After that Mrs. Stroh either bought or was given a half interest in her sister's store at Stuttgart, but again their joint enterprise was unsuccessful. The partnership was dissolved, apparently without hard feelings on either side, by a written agreement dated January 1, 1954. Mrs. Stroh received about $4,000 in the liquidation of the enterprise, but Mrs. Allison testified that the business was really insolvent and that she was compelled to pay a substantial outstanding indebtedness.

The partnership between the sisters ended on January 1, 1954. Word that the venture had resulted in a loss undoubtedly reached Bellville at his home in Eureka Springs. He executed a new will, the one now in question, on March 27, 1954. This will is decidedly favorable to Mrs. Allison. She receives her father's personal property, inventoried at about $10,000, and a life estate in certain Illinois and Eureka Springs real estate, with remainder to her children. The other parcel of land, the Prairie county rice farm, is left equally to the testator's two daughters for life, with remainder to their children.

The contestant, Mrs. Stroh, had the burden of proving undue influence. *Miller* v. *Carr,* 94 Ark. 176, 126 S. W. 1068. We are of the opinion that the weight of the evidence fails to establish the essential elements of undue influence, as defined in this often-quoted language from *McCulloch* v. *Campbell,* 49 Ark. 367 5 S. W. 590: "As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. *And the influence must be specifically directed toward the object of procuring a will in favor of particular parties.*" (Emphasis added.) To the same effect is *Davault* v. *Parks,* 190 Ark. 370, 79 S. W. 2d 68, where we said: "Before a will can be invalidated upon the ground of undue influence, there must be testimony proving or tending to prove that the influence was of such character as to destroy the testator's free agency, in effect substituting another's will in the place of his own, and the influence must be directed toward the object of procuring a will in favor of particular parties."

Here the charge of undue influence rests upon only two circumstances: first, the testator's unequal division of his estate, and, secondly, the assertion that Mrs. Allison had falsely represented to her father that her sister

Wanda had defrauded her of about $30,000 in their mercantile ventures. Lumping these two circumstances together, we think it fair to say that the weight of the evidence indicates that Bellville executed a will favoring his daughter Vera because he believed that she had suffered a substantial loss in her dealings with her sister, and we think it probable that Bellville also was convinced that Wanda had acted dishonestly or at least unfairly.

Even so, the proof of undue influence does not meet the test laid down in the *McCulloch* case, *supra*. The appellee had the burden of proving that Vera's wrongful domination of her father destroyed his free will and that her false statements, if any were made, were specifically directed toward the procurement of a will in her favor. Neither point is sufficiently established. Bellville, despite his age, was mentally alert. He was living at Eureka Springs, 200 miles or more from Vera's home at Stuttgart. The partnership was liquidated as of January 1, the will was executed on March 27, but there is no contradiction of Vera's testimony that she did not visit her father until Easter, which fell on April 18 that year. The will was witnessed by F. O. Butt, an attorney, and we assume that it was prepared by him. It is impossible to believe that Vera was able to dominate her father from more than halfway across the state, and at a time when he was being guided by his own attorney. Moreover, the testator lived for almost four more years without changing the will, thus having ample opportunity to satisfy himself about the supposed charges against his older daughter.

Nor is there any direct proof whatever that Vera Allison maligned her sister for the particular purpose of inducing her father to execute a will in her favor. Whether she made the asserted misrepresentations at all is a sharply disputed issue of fact; but if we assume that she was guilty of slandering her sister there is simply no positive proof to show that her wrongdoing was designed to bring about a favorable testamentary disposition of her father's estate. That the will was actually favorable to her does not supply this gap in the proof;

for in that event any will favoring one of the testator's children would be subject to being set aside upon a showing that false statements had been made by the principal beneficiary about other members of the family.

Reversed.

WARD and JOHNSON, JJ., dissent.

PAUL WARD, Associate Justice, dissenting. The facts and circumstances in this case, as disclosed by the record, present such a close pivotal question that I cannot confidently say the trial judge reached the wrong decision.

It must be conceded that the trial Judge would have been justified by the record in making the following findings: [a] The testator was rather old (age 83) and in poor health when the subject will was executed; [b] He *changed* his will, giving appellant some $30,000.00 more than appellee; [c] He made the *change* because *someone* told him appellee had cheated appellant out of a large sum of money; [d] There appears no other reason for him to discriminate between his two daughters; and [e] If appellant had anything to do with informing her father of the alleged misdeeds of appellee, her action was unwarranted and done with a malign intent.

The only close question is the one posed in the last clause above. The correct answer must be gleaned from the testimony and circumstances disclosed from the record and from an appraisal of the weight given to the testimony of each witness based upon that witness' appearance and demeanor. Since the trial judge had so much better opportunity to evaluate all these elements than I have, I am unwilling to substitute my judgment for his, and, therefore, respectfully dissent to the majority opinion.

JIM JOHNSON, Associate Justice, dissenting. The majority opinion cites the rule set out in *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590, and *Devault* v. *Parks,* 190 Ark. 370, 79 S. W. 2d 68, in support of their conclusion that the decision of the Probate Judge setting aside the will in question is against the preponderance of the evidence. The *McCulloch* case, *supra,* states that ''the in-

fluence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion *or any other cause that deprives the testator of his free agency in the disposition of his property.* And the influence must be specifically directed toward the object of procuring a will in favor of particular parties." (Emphasis added.) This rule was substantially restated in the *Devault* case, *supra.* There can be no question but that the rule set forth in these cases is the law in Arkansas. From a careful reading of the record in its entirety, I cannot say that the probate judge deviated from this rule in setting aside the 1954 will of Perry O.. Bellville.

Mr. L. D. Spangler, a close personal friend and neighbor of the testator, a friend who was so close that he was remembered in the testator's will, was called by the contestees as their witness. Mr. Spangler testified that the testator was sane. However, on cross-examination this friend and confidante testified as follows concerning an event that occurred just prior to the changing of the former will by the testator:

"He (the testator) came over to my home and he was almost crying and he said one of his daughters had, in her business transaction in a store down, I believe in Stuttgart, in settling up, one daughter had beat the other daughter out of something. If I remember right, it was something quite a bit over $4,000.00, now I just forget the amount. And he said, 'I didn't raise my daughters that way.' And he said, 'my will is going to be changed.' And he said, 'The daughter that lost the money will get it back with good interest.' The one that had to pay the other daughter ..."

The record is silent as to how the testator obtained the information that caused him to change his will. The contestee, whom the record reflects had been schooled in dramatic arts, attempts to imply that the contestant herself gave this information to her father. The record does not reflect that the contestant ever dealt with the contestee unfairly, dishonestly or that she ever beat her out of a thin dime. It is true that the parties were associated in a partnership and that the partnership was dissolved with-

out any hard feelings on either side. In fact, the actions of the parties indicate that they continued to have the utmost confidence in each other. The record reveals that after having entered into a business venture in DeWitt, which was dissolved, the contestee prevailed upon the contestant to leave her farm near DeWitt for the purpose of entering into a partnership with her in Stuttgart; that contestant did enter into the partnership, was given the full management of the Stuttgart business and it is undisputed that the volume of sales improved considerably under her management.

The majority opinion says that "it is impossible to believe that contestee was able to dominate her father from more than half way across the state." I assume that the telephone lines between Stuttgart and Eureka Springs are still in operation and were during the time in question. Apparently the Probate Judge believed while listening to the parties testify in person that the contestee gave this information to her father either through the mail, by telephone, or by some other means of communication for the sole purpose of causing him to change his will; that she sold her father upon the unfounded belief that contestant had committed a great wrong to contestee. I agree with the conclusion of the Probate Judge. It is undisputed that this information caused the testator to revoke his former will and execute a new will in 1954 and by this changed will the father reimbursed with "good interest" the $30,000 he was made to believe the offending daughter "beat" the cheated daughter out of, thereby reimbursing the victimized daughter and at the same time punishing the wrongdoer because "I didn't raise my daughter that way."

It is not my understanding of the *McCulloch* and *Devault* rule, *supra*, that the undue influence spoken of therein must reach the point where it is necessary for the influencer to actually have to hold the hand of the testator as he signs his name to a will. The question is, did the contestant by foul practice "beat" the contestee out of $30,000 in such a way as to break the heart and torment the soul of this father of 83 years and then tell her father of

this mischief she had done her sister? Did the contestant inflict this anguish and misery on her aged father to the point where he was impelled to seek relief by opening his bosom and revealing his secret and exposing the wrong of his offending daughter to a neighbor? The contestant testified to the trial court that the first she ever heard of the claimed $30,000 loss was when contestee, at the reading of the will, boldly and brazenly charged that she, the contestant, had told this story against herself to her father. The trial judge who for two days heard every word of 212 pages of conflicting testimony, noted every inflection, observed the deportment of all parties and witnesses, believed the contestant and so do I. It is undisputed that the contestee knew the contents of the will and attempted to prevail upon the son of the contestor to prevent contestor's presence at the reading of the will. It is further undisputed that contestee had discussed with the testator the value of the Eureka Springs property and also the value of property owned in Illinois relative to the reimbursement of the claimed $30,000 "beat."

From this and an abundance of other testimony, the trial court, in effect, found that the author of the 1954 changed will was not Perry O. Bellville, the testator, but that the author of the $30,000 story was the author of the will the trial court set aside. Certainly, I cannot say that his findings were against the preponderance of the evidence.

For the reasons stated above, I respectfully dissent.