LANGFORD *v.* GATES.

5-3292                                    381 S. W. 2d 456

Opinion delivered May 25, 1964.

[Rehearing denied September 14, 1964.]

W. H. Kitchens, Jr. and Melvin Chambers, for appellant.

Joe D. Woodward and Harry Crumpler, for appellee.

CARLETON HARRIS, Chief Justice. This litigation involves the validity of a codicil, executed by Mrs. Hattie R. Gates. On March 28, 1947, following the death of her only child, and only descendant, Mrs. Gates executed a will, leaving all of her property to her husband, Walter L. Gates, appellee herein. Mr. Gates was Mrs. Gates' second husband, and the stepfather of her deceased daughter. On April 16, 1956, Mrs. Gates executed a codicil to her will, under which, at the death of her husband, all her property was devised to Harriet Langford "and the heirs of her body, who are William John Mitchell and R. Reed Mitchell." Mrs. Gates, 76 years of age, died on August 21, 1962, and appellee, then 75 years of age, offered her will for probate. The value of the

estate was listed as $500.00 for the real property and $500.00 for the personal property. The only heir of the deceased was W. O. Roberts, a brother, 75 years of age. Proof of Will was executed by two attesting witnesses, Wade Kitchens and Mrs. L. E. Adkins, Sr. Thereafter, appellant, Harriet Langford, for herself, and as natural guardian and next friend for her children, filed a petition for probate of the codicil heretofore referred to. The petition to admit the codicil was heard by the Probate Court, and, after a number of witnesses had testified, the court found that shortly after the death of decedent's daughter, Mr. Langford started corresponding with Mrs. Gates, and led the latter to believe that she (appellant) was a medium, capable of communicating with deceased persons, including the deceased daughter; that subsequently Mrs. Langford, and two minor sons moved to Columbia County.

"That throughout the acquaintanceship of the decedent and the Respondent, Harriet D. Langford, the Respondent continued to conduct purported seances, meetings and conversations between the decedent and her deceased daughter and other deceased relatives and continued to advise the decedent through her purported clairvoyant powers and that as a result of the same, the Respondent had complete power, control and total influence over the decedent.

"That shortly before the decedent executed the purported codicil to her last will dated the 16th day of April, 1956, the Respondent advised the decedent that she was able to foretell that the decedent and her husband, the Petitioner herein, would die together as a result of a common disaster and that the decedent's brother would inherit the decedent's estate against the decedent's wishes.

"That as a result of this advice the decedent made and executed the codicil to her last will dated April 16, 1956, and that the execution of same was a direct result of the Respondent's undue influence."

In accordance therewith, the court entered its judgment, finding that the codicil was induced by undue influence, and same was set aside, voided, and held for naught. From this judgment, appellants bring this appeal.

To properly understand the issue, it is necessary that a background of the facts leading to the litigation be set out. The evidence reflects that the daughter of Mrs. Gates, whose name was Harriet Wilkes (affectionately termed "Babe" by her family and friends), lived in California at the time of her death, but prior thereto had become acquainted with appellant in Portland, Oregon, in 1946. According to appellant, she (appellant) was a stenographer in a real estate office, and Mrs. Wilkes came to the office to see appellant's employer on business. While waiting, Mrs. Wilkes commenced talking with Mrs. Langford (at that time Mrs. Langford's married name was Mitchell). The two discovered that they had the same name (Harriet), and both were interested in the Spiritualist religion.[1] Thereafter, they attended church together several times, and became good friends. Mrs. Langford (Mitchell) moved to Minnesota, but maintained a correspondence with Mrs. Wilkes. One of the letters written by Mrs. Langford was returned by Mrs. Wilkes' secretary with a note that Mrs. Wilkes had died, and the address of her mother in McNeil was given. Appellant wrote to the mother, and the latter promptly responded, requesting information about her daughter and the association between the two. Thereafter, a steady correspondence was maintained, and finally Mrs. Langford invited Mrs. Gates to visit her while appellant's husband was in Korea. Mrs. Gates accepted the invitation, and spent six weeks in Minnesota. In 1953, Mrs. Langford's husband returned from overseas, and the two went to Fort Sill at Lawton, Oklahoma. Do-

---

[1] In the Encyclopedia Americana, Volume 25, Page 421 through 423, appears an interesting article on Spiritualism. The World Almanac of 1964 reflects that there are over 170,000 members of this religion in the United States, broken down as follows: Int. Gen. Assembly of Spiritualists, 164,072; Natl. Spiritual Alliance of the U.S.A., 3,208; Natl. Spiritualist Assn. of Chs., 5,721.

mestic difficulties arose, and appellant contacted Mrs. Gates, the latter inviting her for a visit, and during this visit, appellant met Mr. Gates. She subsequently returned to Lawton, obtained a divorce, and moved to Shreveport, Louisiana. There, she met Mr. Langford, and, according to the testimony of Mrs. Gilbert Marlar, wife of a McNeil minister, married Mr. Langford in the Gates' home. She and Mrs. Gates visited each other several times. On one occasion Mrs. Gates went to Shreveport to help with the children as one boy had polio. Subsequently, the Langfords moved from Shreveport to Wichita Falls, Texas, remaining there about six months. However, Mr. Langford did not like his employment there, preferring to work on tractors and farm machinery. While visiting in the Gates home, Mr. Langford was taken to prospective employers in that line of work by Mr. Gates, and Langford was subsequently given employment by Magnolia Motors. The couple then moved to Magnolia. This was in July, 1957, and, according to appellant, she and her family are still living there, purchasing a home.

The foregoing facts are undisputed in the record; likewise, it is undisputed that seances were conducted, and Mrs. Langford claimed on some of these occasions to have had communication with "Babe" and other members of the Gates family, including Mrs. Gates' parents, and two other daughters, Mary and Louise, who had been born prematurely and had died in infancy. These communications included reports of the activities of the deceased persons in the "spiritual world." Appellant wrote her impressions and gave them to Hattie Gates; the latter also, at times, felt that she was communicating with the "spiritual world," and made notes of her impressions, including conversations with her mother and father, two of her daughters, and other relatives. These messages were referred to as "readings."

Five witnesses testified in behalf of Mr. Gates, *viz,* Oren Roberts, a brother of Mrs. Gates; Lillian Butler Roberts, his wife; Mrs. Fay Reagan, a friend of the fam-

ily; Mr. Louis Braswell, a neighbor; and Cecil Fowler, superintendent of schools at McNeil, also a neighbor. All stated that Mrs. Gates strongly believed in the Spiritualist religion, and would frequently talk with the witnesses about this religion; that she was rather "fanatical" on the subject, but all likewise pretty well agreed that, outside of her religious discussions, and an extreme nervousness, her mental condition seemed to be entirely normal. Mr. Fowler specifically stated that in matters other than religion, Mrs. Gates appeared "as normal as the average person." Several of the witnesses testified that Mrs. Langford was frequently at the Gates home, and Mrs. Reagan stated that she felt that appellant exerted extreme influence over Mrs. Gates.

Mr. Gates testified that his wife had three children by a prior marriage, but only "Babe" survived to adulthood. He stated that he first heard of Harriet Langford soon after the daughter's death, and that it was because of the acquaintance of "Babe" with Mrs. Langford that the contact was made with his wife. He said that they corresponded nearly every week, and he further testified that, as far as he knew, his wife never believed in Spiritualism until after her acquaintance with appellant. Appellee stated that his wife went to Minnesota to learn more about the religion, and that she stayed in Minnesota about thirty days; upon her return, she had been converted, and believed in Spiritualism. Continuing, the witness stated that Mrs. Langford visited in the Gates' home on many occasions, and seances were held in the home. Mr. Gates testified that his wife became a nervous wreck, and that after a seance, or reading, she was upset for several days. He stated that he sat in on some of these as a matter of pleasing his wife, and pretended to believe in the religion in order to have "some peace in my home with my wife." Appellee testified that Mrs. Langford, in 1954, told them that they were going to die in a common disaster, apparently an automobile accident.

"She [referring to appellant] got my wife in such a nervous condition and so upset over it that she wouldn't

go anywhere in the car with me, wouldn't even come to town with me. She had her disturbed so there that she was afraid I was going to get in a wreck or something or another and kill both of us, she always preached about my driving. I drove a car back there in the old dirt road days and I drove over many states.''

He stated that his wife's mental condition prior to the daughter's death in 1947 was very good, but subsequently, her mental condition was ''terrible,'' and this condition generally grew worse after receiving a letter from, or engaging in conversation with, Mrs. Langford. Mr. Gates said that there was friction between his wife and her brother, W. O. Roberts, and his wife told him that she was going to make a will ''so that if we were both killed during an accident and she fixed it so Harriet could get what was left.'' When asked if he thought it was his wife's intent to put a common disaster clause in the will, he replied, ''that is what she should have done.

\* \* \* I think she did, that is what she told me.'' He stated that the will and codicil were kept by Mrs. Gates in a lock box in the home, and that he did not have access to the lock box, and did not see the will or codicil until after his wife's death.

Mrs. Langford denied mentioning anything about property to Mrs. Gates, denied making the statement about the common disaster, but stated that, while living in Shreveport,[2] Mrs. Gates, during a visit, told her one day,

'' 'Now, I have something to tell you, and I want you to marks this well,' and I didn't know what was coming. I said, 'Well, what is it?' and she said, 'Last week we decided we would redo the will,' or something, I don't know just how she put it now, and she insisted I find something to write on and I had to scramble around to find a piece of paper and she said, 'No, something that is permanent,' and the only thing at hand was a beat up address book I keep and she said, 'Write this down:

---

[2] It is undisputed that Mrs. Langford was living in Shreveport on April 16, 1956, date of the codicil.

"Gates business,' " and I still didn't know what to think of it, I was sort of surprised, and she told me to write down the name of Wade Kitchens and I hadn't heard of it before and she said, 'His son is Hampton Kitchens. If I should pass away, you be sure to go to that office, there will be something there for you,' and I had no idea what or how much or anything, and I couldn't ask her, I was so surprised, I was sort of touched and too surprised to even ever ask her what it was.' "

She denied any knowledge of the codicil, or knowing of the devise, until after the death of Mrs. Gates, when Mr. Gates mentioned the codicil to her. Appellant stated that he told her the only reason the amendment had been made was to keep Mrs. Gates' brother, Oren, from getting any of the property, and he suggested that she go to Kitchens' office to see the will, and the amendment. Mr. Gates verified that he mentioned the codicil to her but said that he did not remember telling her that the codicil was added to prevent her brother and his family from inheriting as her next of kin. Mrs. Gilbert Marlar, wife of the Methodist minister of the church at McNeil through 1956, testified that Mrs. Gates was a strong willed person and that she did not see any difference in Mrs. Gates' mental capacity during the time that she knew her (through 1956).

This, then, is a summation of the evidence upon which the court found that undue influence had been exercised by Mrs. Langford over Mrs. Gates, and that the codicil was the result of such undue influence.

What is "undue influence?" In *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590, that term is given a definition that has been quoted and cited, as stated by the Arkansas Law Review[3] "with such frequency as to acquire the character of a juridictional classic." The opinion, written by Associate Justice William W. Smith, states:

---

[3] 7 Ark. Law Review, Page 116, a comment by George Banks Collins.

"As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. *And the influence must be specially directed toward the object of procuring a will in favor of particular parties.* [Our emphasis.] It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

The italicized phrase was emphasized in the case of *Allison* v. *Stroh,* 231 Ark. 862, 333 S. W. 2d 737, which opinion also quoted from *Davault* v. *Parks,* 190 Ark. 370, 79 S. W. 2d 68, as follows:

" 'Before a will can be invalidated upon the ground of undue infucnce, there must be testimony proving or tending to prove that the influence was of such character as to destroy the testator's free agency, in effect substituting another's will in the place of his own, and the influence must be directed toward the object of procuring a will in favor of particular parties.' "

We are firmly convinced that, under the rule herein cited, together with cases hereafter mentioned, that the court erred in its finding, and should have admitted the codicil to probate.

What arc the facts upon which appellee relies?

1. The evidence of Mr. Gates that Mrs. Langford had told appellee and his wife that they would die in a common disaster.

2. The fact that Mrs. Gates grieved terribly over the death of her daughter, and did not adopt the Spiritualist religion until becoming acquainted with Mrs. Langford.

3. The fact that Mrs. Langford and Mrs. Gates conducted seances, corresponded regularly, and visited regularly together.

4. The fact that Mrs. Gates apparently had complete confidence in Mrs. Langford, and, according to some witnesses, was strongly influenced by her.

It will be noted that there is *not a single line of evidence in this record to the effect that appellant directed any influence toward the object of obtaining a will in her favor (or in favor of her children)*. Frequently, where questions of undue influence arise, the party accused of exerting same is present when the will is made, or takes the testator to a lawyer's office. But here, it is undisputed that Mrs. Langford was in Shreveport at the time of the execution of the codicil, and there is no evidence at all that she knew the contents of the instrument until after the death of Mrs. Gates. The only evidence even coming close is the statement of Mrs. Langford that Mrs. Gates had told her that she was redoing the will, to go to Kitchens' office (after her death), and "there will be something there for you."

It was stipulated between counsel that the witnesses to the codicil, *viz,* Wade Kitchens and Gladys K. Pickens, would testify to the same facts sworn to in executing the "Proof of Will." This means that it is conceded that Mr. Kitchens and Mrs. Pickens would have testified that at the time of the execution of the instrument, Mrs. Gates appeared to be of sound mind, and acting without undue influence, fraud, or restraint. Actually, it would not appear that there was enough property involved to cause Mrs. Langford to design a course by which to obtain it, though the real estate is apparently somewhat more valuable than the figure given by Mr. Gates at the time of probating the will.

Of course, we are all influenced by our friends, and frequently seek their advice, very often in preference to seeking the advice of relatives, and it is not difficult to understand why these two women held a close rela-

tionship. Both had a common affection for the daughter who had died, and the fact that the daughter and Mrs. Langford both had the name, "Harriet," probably initially aroused some interest in Mrs. Gates; each was interested in the same religion, a religion which was not shared by anyone else in the community. Mrs. Gates' interest in this religion probably was stimulated by the fact that it was the religion of her daughter. In addition, Mrs. Gates was quite devoted to appellant's children, and, as previously mentioned, went to Shreveport to be of assistance when one of the children was stricken with polio. The proof thus establishes that they were unusually close friends, and it is not out of the ordinary for testators to remember friends in their wills. The affection that Mrs. Gates held for appellant is well demonstrated by the fact that the former presented to Mrs. Langford in January, 1954, a book, "Your Mental Mirror," which had been written by her daughter. In the book, Mrs. Gates wrote:

"Presented to Harriet G. Mitchell January 2, 1954 by Hattie Roberts Gates, mother of Harriet Clark Wilkes, in loving memory of my beloved daughter to a friend she loved so well. May the passing years cement our love for each other more closely and may we make great progress in the subject most dear to our hearts."

Let it be remembered that her husband was first provided for, and appellants would not receive anything until after the death of Mr. Gates. Here, a rather noticeable circumstance should be mentioned. The Chancellor apparently relied to a great extent upon the testimony of appellee to the effect that Mrs. Langford had stated that appellee and his wife would die in a common disaster, and he held that this influenced Mrs. Gates in making the codicil. Yet, if Mrs. Gates believed this statement, *why did she include Mr. Gates in the will at all?* He certainly could not enjoy a life estate if he were dead. It is established by the evidence, and stands undisputed, that Mrs. Gates did not like her brother, Oren Roberts, and it is easily understandable that she would

prefer to leave the remainder to friends, rather than to have her husband's relatives eventually take same.[4]

It is also observed that this codicil was not made during a last illness, or during a period of stress, but rather was executed a long time before the death of Mrs. Gates. In *Allison* v. *Stroh, supra,* we commented that the testator lived for almost four years after making the will; here, Mrs. Gates lived over six years after executing the codicil, and, accordingly, had every opportunity to make a change.

Actually, it appears that appellee's witnesses could not understand Mrs. Gates' adopting and becoming obsessed with a religion, some features of which, to a nonbeliever (in Spiritualism) might well appear farcical and preposterous, and this strongly contributed to their opinion of undue influence.

Be that as it may, under the facts in this litigation, we find nothing abnormal or particularly unusual in Mrs. Gates' disposition of the property, but were it otherwise, the result would be the same. As stated in 94 C.J.S., Section 226, Page 1075:

"Every influence exerted on a testator is not undue influence, and it is well settled that influence, consisting of appeals, requests, entreaties, arguments, flattery, cajolery, persuasion, solicitations, or even importunity, is legitimate and becomes 'undue,' so as to invalidate the will, only when it is extended to such a degree as to override the discretion and destroy the free agency of the testator."

As we said in *Allison* v. *Stroh, supra,* the undue influence must be of such character as to actually amount to substituting another's will in the place of that of the testator, and in *Black* v. *Dunklin,* 224 Ark. 528, 275 S. W. 2d 447, we find:

"Certainly, Mrs. Black had the legal right to dispose of her property in any manner that she saw fit, and the

---

[4] Mr. Gates has three nieces and one nephew, whose names do not appear in the record.

fact that such disposition might appear on its face to be unnatural, or inequitable, would have no bearing on the matter whatever—if such disposition expressed the will of Mrs. Black.''

We are convinced that the codicil in question was voluntarily made, and expressed the desire of the deceased, *i.e.*, it was ''her will.''

In accordance with the reasoning set out herein, the judgment is reversed, and the cause is remanded to the Columbia County Probate Court, with directions to admit the codicil to probate.