Rogers *v.* Crisp, Ex'x.

5-3958                                    406 S. W. 2d 329

Opinion delivered September 26, 1966

*Chambers & Chambers,* for appellant.

*McKay, Anderson & Crumpler,* for appellee.

Carleton Harris, Chief Justice. Joe R. Lewis, a resident of Columbia County, died testate on December 26, 1964. An instrument, purporting to be his last will and testament, dated June 22, 1964, was offered for probate. The will designated Jean Welch Crisp, a friend and neighbor, as sole beneficiary. Appellants[1] objected to the probate of the will, asserting that Joe R. Lewis

---

[1]Appellants are Mildred Rogers, Lucy Peterson, Florence Edwards, all sisters of the deceased, and the following nieces and nephews: Glen Lewis, Willie Elliott, Gussie Barron, Vera Hendricks, Leslie Dendy, Louise George, Marie Vent, Gertrude Thornton, Emma Sprick, Fred Lewis, Ray Lewis and Fannie (Jo) Demarco; also Dewey Booth, only heir of Phronia McDonald, a sister of Joe R. Lewis.

was not mentally competent to execute the will on June 22, 1964, and further, that he was acting under undue influence at the time of its execution. On trial, the court found that Lewis was mentally capable of executing the will; that he did execute it without undue influence, and the instrument was admitted to probate. From the judgment so entered, appellants bring this appeal.

Ten witnesses, including three of the heirs, and a daughter of one of the heirs, testified on behalf of appellants, and eight witnesses testified on behalf of appellee. As is usual in this type of case, the testimony was "poles apart," appellants' witnesses maintaining that Lewis was mentally incompetent to execute the instrument, and appellee's witnesses just as emphatically testifying to the contrary.

Donald Shocklee, a neighbor, 18 years of age, testified that Lewis could not dial telephone numbers, because he could not remember while dialing . . . he would take a bath, and sometimes walk out of the bathroom unclothed before company . . . while his wife was ill,[2] milk, which had been purchased for her by the witness, was poured down the sink by Lewis . . . he left his wife alone during storms . . . he carried large sums of money in his billfold, but would misplace the billfold, and couldn't find it . . . he would take three or four pills of the same prescription, and forget he had taken them . . . he would subscribe for the paper, have it stopped, and subscribe again.

Mrs. Nina Martin, daughter of Mrs. Peterson, testified that she stayed with Lewis for a period of time after his wife's death; she would leave the house, telling him where she was going, but upon returning, he would ask where she had been; after his wife died, he asked several times if there were any flowers or cards, and when she called off the names and called her own name, he inquired, "Who is that?"

---

[2]Mrs. Lewis died in November, 1963.

Mrs. Edwards, a sister, testified that her brother would frequently get lost, and would run red lights in the automobile; he had knocked the bumper off her car, but could not remember it.

Missouri Johnson, who was employed as a housekeeper by Lewis and his wife, testified that Lewis liked "to talk about women and, you know, doing things"... she also said that he would take his medicine, and soon thereafter "take it again." The witness testified that, after she had quit working for him, Lewis would come to her house, and ask her to go to the home of Jean Crisp, and get Jean "to start back to talking to him;" that he made this request about twenty-five times, and finally stated that he would get his gun and shoot her unless she complied with the request.

Lucy Peterson testified that he took one of his sisters' dental plates to Waldo, and left it at a grocery store instead of with the dentist ... that he had several car wrecks.

Leslie Dendy, a nephew, stated that Lewis could not carry on a normal conversation, would ask a question, and while it was being answered, change to another subject.

O. A. Phillips testified that Lewis' mind "would kind of go and come."

Sam Capps testified that for the last several years of his life, Lewis could not answer questions clearly, and Julia Turk testified that, at his wife's funeral, Lewis talked out loud during the service. The testimony of Dr. Joe Rushton, physician of Magnolia will be subsequently discussed.

Wendell Utley, an attorney, who had known Lewis for approximately twenty years, and who prepared the will in question, stated that the testator came into his (Utley's) office by himself, and said that he wanted to

leave his property to Mrs. Hamilton Crisp. Utley testified that the will was typed up at that time, read to Lewis, and was signed in the presence of the witness and Dr. William A. Carter, an optometrist, whose office was near that of Utley. The attorney stated that he had previously prepared two wills for Lewis, the first naming a brother in El Dorado as beneficiary; after that brother's death, a second will was prepared, naming a sister as beneficiary.[3] The witness said that there was no question in his mind but that Lewis knew what he was doing, and that the will was executed voluntarily. Dr. Carter testified that he noticed nothing abnormal about the testator, and that he knew him, having previously fixed glasses for him.

Harry Cobb stated that he sold Lewis an automobile in October of 1964, and the latter thoroughly understood the transaction, and acted no differently from some years before, when Cobb had also sold an automobile to Lewis.

Mrs. Estes McIntyre testified that Lewis would take her to shop for groceries; had taken a few meals at her home, and he knew his brothers, sisters, and his property. Lewis had told her that he had made a will in favor of Jean Crisp:

"A. Well, he just said she had been real good to him and that when he was down, when he didn't have anybody else to turn to, she come to him and told him that he could live with them or just however he wanted to do it, as long as he wanted to."

Four other witnesses, Richard Walters, W. M. Beasley, William Robert Kelly, and Bob Sanders, all of whom had known Lewis from twelve to thirty years, testified that they noticed nothing unusual about his condition in

[3]From the testimony: "Q. Did he know he had already made another will out to his sister? A. Yes, he knew that, he decided to destroy it and make out another will to Mrs. Crisp, seemed like he had fallen out with his sister for some reason, I don't remember just what."

1964. Sanders stated that he was the "same old Joe," except that he was nervous.

Let us bear in mind that, as to mental competency, the question is whether Joe Lewis was competent to make a will on June 22, 1964. His condition, either before, or after, that time, is not the test, and such evidence is only relevant insofar as possibly indicating his condition on the date in question.

The strongest testimony offered by appellants was the testimony of Dr. Rushton. The doctor stated that he sent Lewis to the Veterans' Hospital in Shreveport in December, 1963, because "his mind got so bad," and it was his opinion that Joe Lewis was never normal after that time; however, it is not clear whether Dr. Rushton saw Lewis in June of 1964, or if so, the time of, and circumstances connected with, such a visit. When asked specifically if Lewis would have been able to comprehend the property he had, and his heirs at the time he executed the instrument, the doctor replied "I might say this, I think he could be talked into anything, easily influenced. I don't think his mind was clear enough that he could reason out as to what he would want to do with his property." This, of course, is not an explicit answer to the question interrogated. The doctor also stated that at times "he would seem fairly well," but it was obvious that Dr. Rushton just did not consider Lewis normal. Of course, it is of some significance that the hospital released Lewis, after treating him for a while. In *Thiel, Special Admr.* v. *Mobley*, 223 Ark. 167, 265 S. W. 2d 507, we said:

"The burden was on appellee, the contestant, to prove the lack of mental capacity *at the time the will was executed*.[4] This court has held many times that the burden of proving mental incapacity to make a will rests on the one alleging it."

In that case, several witnesses stated that Mrs. Mob-

---

[4]Emphasis supplied.

ley was not normal, did not recognize the witnesses at times, and appeared, on occasion, to be in a stupor. Other witnesses contradicted this testimony. We held, however, that the testatrix was competent to execute the instrument. Of course, people frequently commit acts that other persons do not consider normal, but this does not establish incompetency to make a testamentary disposition. It certainly appears from the evidence that Lewis was aware of the fact that he had relatives; that he knew those relatives; that he was aware of the property he owned, and that he was aware of the fact that he had left the property to Mrs. Crisp. Peculiarities and eccentricities, as distinguished from insanity, are thoroughly discussed in *Harwell* v. *Garrett,* 239 Ark. 551, 393 S. W. 2d 256. Quoting from Volume 1, Page on Wills, Section 12.37, the court said:

"The fact that the testator was filthy, forgetful and eccentric, or that he was miserly and filthy, or that he was blasphemous, filthy, believed in witchcraft, and had dogs eat at the same table with him or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on for two weeks at a time, or that he would leave his home only at night, and would count or recount his money, or that he was high tempered and violent, or was irritable and profane, or that testator thought that others were plotting against him and was afraid to go out in the dark, or that he was inattentive when spoken to and mumbled when trying to talk, does not establish lack of capacity."

It might be added that "running red lights" and being involved in automobile wrecks, misplacing one's billfold, mistreating members of the family and being unable to use a dial telephone are acts that are many times committed by perfectly normal people.

It is not unusual for some member of a family to feel that he has been mistreated by other members of the family, and, whether right or wrong, it is apparent that Lewis had "fallen out" with his sister. Nor can it

be said to be abnormal or unnatural for a testator, without wife or children, to leave property to a good friend rather than to a collateral relative.

The proof as to undue influence was extremely meager, and, in fact, only two instances are mentioned by appellant. It is asserted that the testimony of Missouri Johnson establishes that ''Jean must have been putting some pressure on him or he would not have gone to Missouri's so many times to get her to talk to Jean.'' Of course, the quoted portion (from the brief) itself makes evident that speculation would have to be utilized to the utmost to consider this fact as any proof of undue influence. The only other act mentioned is that Mrs. Crisp called the attorney some time after the will was made to inquire if Lewis had made a will. Even if it were established that Mrs. Crisp had begged Lewis to execute a will in her favor, this fact would not establish undue influence. In *Langford* v. *Gates*, 238 Ark. 167, 381 S. W. 2d 456, this court, quoting C.J.S., stated:

''Every influence exerted on a testator is not undue influence, and it is well settled that influence, consisting of appeals, requests, entreaties, arguments, flattery, cajolery, persuasion, solicitations, or even importunity is legitimate and becomes 'undue,' so as to invalidate the will, only when it is extended to such a degree as to override the discretion and destroy the free agency of the testator.''

It is also noticeable that Lewis, *unaccompanied*, went to *his* lawyer's office, and directed the disposition of the property. A similar circumstance is commented upon in *Langford* v. *Gates, Supra*. The will was not executed during a last illness, but rather several months before his death, and Mr. Lewis had every opportunity to revoke it had he desired to do so. To the contrary, he mentioned to friends some time after signing the instrument that Mrs. Crisp had been kind to him, and that he had left her his property.

Of course, whether one is found mentally competent to execute a will depends upon the particular facts and circumstances in each case. In this type of litigation, where the testimony is generally so much at variance, the findings of the Probate Judge, who heard the evidence and saw the witnesses, carry considerable weight.

As stated in *Thiel, Special Admr.* v. *Mobley, supra*:

While we try the case *de novo*, we must affirm unless we can say that such findings are against the preponderance of the testimony, and in this particular kind of a case we have frequently said that the findings of the Chancellor have persuasive authority and are entitled to weight and consideration.''

We are unable to say that the court's findings are against the preponderance of the evidence.

Affirmed.