HARWELL v. GARRETT

5-3480                                          393 S. W. 2d 256

Opinion Delivered May 31, 1965.

[Rehearing denied September 20, 1965.]

*Jack Machen* and *McKay, Anderson & Crumpler,* for appellant.

*Keith, Clegg & Eckert,* for appellee.

CARLETON HARRIS, Chief Justice. This is a will contest. Frank Garrett, a lifelong bachelor and resident of Columbia County, executed his will on January 21, 1950, leaving his entire estate to his brother, A. C. Garrett. Frank died on February 27, 1962, at the age of 83 years, and in due time, appellee A. C. Garrett petitioned the Columbia Probate Court for admission of the will to probate. Thereafter, appellants filed their contest. Lillie Garrett

Viston and Otis Harwell, appellants herein, are respectively the sister and nephew of the testator. Following a lengthy trial, the court dismissed the contest and admitted the will to probate, and from such order comes this appeal.

For reversal, it is contended that Frank Garrett lacked testamentary capacity, and that, in executing the will, he was acting under undue influence.[1] These contentions are so interwoven that they can hardly be discussed separately.

A factual background is in order. Frank, A. C. (Asa) and Lillie were the three surviving children of Levi Garrett,[2] who died testate in 1946, leaving his estate to Frank and Asa. Lillie and Harwell contested that will, alleging that Levi was mentally incompetent to make a will, and that undue influence had been exercised upon him by Frank and Asa. That contest was unsuccessful. Levi had been a successful farmer, but during the 1930's, oil was discovered on his property, and on other property owned by Asa. Frank's estate consists of real property, bank accounts, and oil income, obtained from property which he inherited from his father.

The record in this case is voluminous, containing the testimony of sixty-three witnesses and eleven depositions. Included is the testimony of schoolmates, neighbors, business acquaintances, oil company employees, who worked on the Garrett wells, and various citizens of Magnolia. The Chancellor, at the conclusion of the evidence, rendered a comprehensive opinion, discussing the testimony of a large number of the witnesses, and this opinion will be subsequently referred to.

Winston O. Wilson, Executive Vice-President of the First National Bank of Magnolia, was one of the witnesses to the execution of the will. He testified that he saw Frank Garrett sign the instrument, and stated that Garrett said that he also wanted two others present, W. R. Gantt, Jr., and W. C. Blewster, to witness the will.

---

[1] Originally, the complaint also alleged that the signature of Frank Garrett was a forgery, and this issue was included in the trial below, but the allegation has been abandoned on appeal.

[2] Harwell is the son of a deceased daughter, Alice.

Wilson testified that Gantt also signed as a witness.[3] The will had been prepared by a Magnolia attorney in the bank building. Appellants attempt to establish that A. C. Garrett brought Frank into town for the purpose of making the will. This, in itself, of course, proves nothing, and for that matter, frequently happens, and, in some instances, beneficiaries actually take the testator to the lawyer's office without ever being accused of exercising undue influence. One argument advanced by appellants is under the sub-heading, "Asa wanted Frank to execute a will to him." The proof was not very extensive on this point, but at any rate, it certainly did not establish undue influence. In *Langford* v. *Gates*, 238 Ark. 167, this court, quoting from 94 C.J.S., Section 226, Page 1075, stated:

"Every influence exerted on a testator is not undue influence, and it is well settled that influence, consisting of appeals, requests, entreaties, arguments, flattery, cajolery, persuasion, solicitations, or even importunity, is legitimate and becomes 'undue,' so as to invalidate the will, only when it is extended to such a degree as to override the discretion and destroy the free agency of the testator."

Another sub-head asserts that "Frank was under the control of Asa," and this will be hereafter discussed.

There is no direct evidence that Frank Garrett was acting under duress at the time of the execution of the will. As long ago as 1887, in *McCulloch* v. *Campbell*, 49 Ark. 367, 5 S. W. 590, this court said:

"As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposi-

---

[3] Gantt died before the will was offered for probate. Gantt's signature was established by the testimony of Wilson, T. A. Monroe, a vice-president of the bank, Mrs. John Dexter, former wife of Gantt, and W. C. Blewster, President of the First National Bank of Magnolia.

tion of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

See also *Rosenbaum* v. *Cahn*, 234 Ark. 290, 351 S. W. 2d 857, and *Langford* v. *Gates, supra.*

Appellants' strongest arguments are based on their allegations and evidence offered to the effect that Frank Garrett was mentally deficient to the extent that he did not possess testamentary capacity. Appellants strongly argue this contention, and evidence was offered to the effect that Frank had been considered dull, even in school days, probably not finishing the first or second reader; that he was rather quiet and timid, and rarely joined with the other children in the games that would be played. Testimony was introduced by appellants to the effect that Frank would not clean up, but constantly wore the same dirty clothes, "smelled bad," liked to take a bath in the creek, spent very little for groceries, stating that a $20.00 bill "had to do him a long, long time," was not interested in modern conveniences, and appeared to think more of his crops than his oil wells. Others testified that Frank would say that he had no money, and as authority for this statement would quote his brother, Asa, as saying, "The government got all their money," and indicate otherwise that his opinions were formed by what Asa had to say. Oil field workers, who would see Frank off and on over several years, emphasized that he was uncommunicative, and had little to say, except to comment about crops or the weather. There was testimony that Frank would eat cheese and crackers for lunch, and a neighbor testified that one day he saw Frank hide some peanuts behind a fence "because he didn't want Asa to know about the peanuts, he would take them away from him." Evidence was offered that Frank lived in filth, rarely shaved, and had frequently stated that he would rather have a water well than an oil well. Frank was

apparently more interested in agriculture than in oil, and this seemed strange to some of the witnesses.

The Chancellor commented on some of the testimony as follows:

"* * * One witness, Lee Roy Hollier, who now lives at Norphlet, Arkansas, where he has lived since the latter part of 1951, testified that he formerly lived in Columbia County where he was an oil gauger; that he first met A. C. Garrett in 1939; he met Frank Garrett shortly after he met A. C. Garrett; that every time he saw Frank, with one exception, he was dirty; he never had any business transactions with him, that all of his dealings were with A. C. Garrett; that Frank seemed to be more interested in growing peas and farming than in oil wells; he saw Frank cutting trees; he never heard Frank talk about current events and in his opinion he did not believe Frank even knew, during the years 1942 and 1943 and 1944, that we were involved in World War Two and in his opinion he did not possess the mental capacity of a child of more than nine or ten years of age. He further testified that he never saw Frank Garrett reading; also, on cross examination, he said he never read anything himself in front of Frank Garrett. Later the same day the Respondents[4] called another oil field worker as a witness, Mr. Hartley, who testified that during the War Frank Garrett came by where he was working and during the conversation asked him if he had heard any war news. Another of Respondents' witnesses, C. B. Simmons, an oil field worker, testified that Frank discussed with him food rationing during the war. In the light of this evidence from Respondents' own witnesses, the Court is of the opinion that Mr. Hollier's statement as to Frank Garrett's capacity or incapacity is not of much value.

"The Court certainly is not impugning the motive or credibility of people who testified for the Respondents, regarding the mental capacity of Frank Garrett, but at the same time the Court cannot overlook the fact that most of their opinions are based upon a few casual and

---

[4] Here, appellants.

brief conversations without any business dealings or transactions with Frank Garrett. One witness offered by Respondents who testified that in his opinion Frank Garrett was not capable of doing business was Mr. N. W. White but according to his testimony, he tried to sell Frank Garrett a car on one occasion while he was in the automobile business and also testified that he tried to buy royalty from him and further stated that if Frank had agreed to buy a car, he would have sold it to him and that if he had a title opinion from an attorney, he would have bought royalty from him. This Court has known Mr. White for a long number of years and knows him to be a very high type man and, being committed to the belief that Mr. White would not take advantage of an incompetent person, I do not see how he could have concluded that Frank Garrett was not capable of transacting business when Mr. White testified that he undertook to do business with him. * * *

" * * * Another witness offered by Respondents for the purpose of showing mental incapacity, a Mr. Beard, testified that in a conversation with Frank Garrett concerning damage which salt water was doing to his timber, Frank Garrett told him the number of board feet in trees which had been damaged by salt water. Harry Baker, another of Respondents' witnesses, who is 67 years of age, testified he was born within three quarters of a mile of the Garrett place and lived there until 1918; that he has known the Garretts since he was six years old; that his family and the Garrett family visited with each other; that he ginned cotton at the Garrett's Gin; that even though Frank Garrett was some fifteen years older than Mr. Baker, he testified they hunted together; that Frank was a good hunter; he knew the woods and he knew the Garrett land, knew when he was on their land or not on their land while in the woods hunting and that in his opinion Frank was not competent to execute a Will or transact business. After considering testimony of this type, the Court cannot help but feel that when Respondents own witnesses testified Frank Garrett knew his land, knew that Salt Water was damaging his timber and knew how to even estimate the number of

board feet in the damaged trees, certainly this is not descriptive of one who is mentally incompetent. * * *

"Wilbur and Minnie Ford, his wife, were offered as witnesses for the Respondents to show the incompetency of Frank Garrett. Mr. Ford is a former oil field worker who moved from Columbia County in 1941 and did not return until 1956 when he and his wife, while in Columbia County and driving in the vicinity of near the Garrett place, came upon Mr. Frank on the side of the road. Both Mr. and Mrs. Ford testified that Frank Garrett, without any forewarning or any prompting, recognized Mr. Ford and called him by name although he had not seen either of them for approximately fifteen years. * * *

"Numerous witnesses also testified for the Proponent to rebut the testimony offered by the Respondents and likewise many of their witnesses were neighbors and people who were closely associated with Frank Garrett, who had worked with him and who had actually transacted business with him. Ned Baker, age eighty, was a school mate and lifelong acquaintance of Frank Garrett. He testified that he went to school with Frank and to Church singings and did the same sort of work. that Frank Garrett did and actually worked with him and had numerous conversations with him and he also testified that Frank Garrett got along in school as well as the average; that he was a good farmer and would exchange ideas with him about how to do farm work * * *

" * * * Roy Couch, seventy years of age, testified he had known Frank Garrett most all of his life, * * * that Frank could estimate the depth of an oil well by the number of drilling pipe that was stocked in the derrick. Mr. V. S. Parham, a witness for the Proponent and a resident of Magnolia, testified he has known the Garretts since about 1921 or 1922 and has been engaged in the oil business since 1935; prior to that time he was in the feed and grocery business and that he has sold groceries to Frank Garrett; that Frank always knew what he wanted, made his purchases and resisted any attempt to be sold items which he did not want. This witness further testified that in November, 1937, he purchased from

Levi Garrett, Frank Garrett and A. C. Garrett a mineral interest in lands owned by them; that during the course of this transaction, on several occasions, he talked with Frank Garrett alone about the proposed purchase, talked with Frank also in the presence of Levi and A. C. Garrett; that originally offered but finally agreed upon a price which was the highest price paid for royalty in that area; * * *

"Corbin Yelvington, formerly an employee of the Land Department of Lion Oil Company, testified he had known Frank Garrett most all of his life; that in 1928 he bought timber from Levi Garrett, the trees he bought were marked and Frank Garrett alone accompanied this witness and showed him the trees to be cut; * * *"

The above constitutes only excerpts from a lengthy opinion, but it is apparent that the testimony was much in conflict; it is also evident that some of appellant's own witnesses contradicted themselves at times.

It is, of course, pertinent to mention the degree of mental capacity required in executing a will. Let it first be stated that one does not have to be a genius, a college graduate, a high school graduate, or even have attended grade school, to make a will. While a male minor, generally speaking, is unable to enter into binding contracts (he must first attain the age of 21 years), the law does not require that one be an adult before being capable of executing a will. This may be done when a minor reaches the age of 18.

In Volume 1, Page on Wills, Section 12.20, we find two cases cited on this question as follows:

"The making of a will does not require so high a degree of mental capacity as does the making of deeds or contracts. Making a will is not a matching of wits. It is giving, not bargaining. *Huffnagle* v. *Pauley* (Mo.) 219 S. W. 373.

"Where the Court gave a correct statement of what testamentary capacity was, in law, it was held not to be error to add that it required less mental powers to make a will than it did to make a contract. *Gable* v. *Rouch,* 50 S. C. 95, 27 S. E. 555."

Again, in Section 12.37 of the same volume, we find a discussion of "eccentricity," as follows:

"To distinguish eccentricity from insanity is easy in theory and difficult in practice. Eccentricity is deviation from the methods of conduct and behavior usual to the great mass of mankind similarly situated. Every person has slight peculiarities of his own, which may never cause any suspicion of his testámentary capacity. It is only when they become pronounced by contrast with those about him that they become known as eccentricities, and are invoked to discredit his testamentary capacity. Eccentricity has no effect on testamentary capacity; and the wills of persons who are highly eccentric, and in some cases eccentric to the verge of insanity, have been upheld. This is especially true where eccentricity is due, not to any form of mental derangement, but to vanity, selfishness and the like. A testator may avoid the society of others and yet be sane enough to make a will.

"The fact that the testator was filthy, forgetful and eccentric, or that he was miserly and filthy, or that he was blasphemous, filthy, believed in witchcraft, and had dogs eat at the same table with him or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on for two weeks at a time, or that he would leave his home only at night, and would count or recount his money, or that he was high tempered and violent, or was irritable and profane, or that testator thought that others were plotting against him and was afraid to go out in the dark, or that he was inattentive when spoken to and mumbled when trying to talk, does not establish lack of capacity."

It is true that Frank Garrett may not have always acted in a manner consistent with what the average person considers "normal," but the acts mentioned by appellants, we think, at most, only establish that Garrett was "peculiar," and it might be added that, frequently, wealthy persons act as though extremely poor, and there are, of course, numerous instances where eccentric persons have lived in abject poverty, though thousands of dollars would be found on the premises. Our own court,

in the case of *St. Joseph's Convent* v. *Garner,* 66 Ark. 623, 53 S. W. 298, said:

"Over the objections of the plaintiff, Jacob Hufsteder, J. A. Luttrell and D. W. Reynolds, who did not attest the will, were allowed to testify as to the mental capacity of Ellen McKenzie. Hufsteder testified that her mind was weak and that he did not think that she understood what a contract is. Luttrell did not think that she was very bright, or that she was capable of making wills or contracts, and testified that her teacher said that she could not learn anything; and Reynolds said she did not have a bright intellect like other children.

"The effort to impeach the testamentary capacity of Ellen McKenzie was indeed feeble. * * * The substance of it was, she was 'weak-minded,' 'not bright,' not as intelligent as other girls. * * * The fact that her mind was weak, not 'bright,' or that she was not as intelligent as the average girl, does not show that she did not have sufficient testamentary capacity to execute the will in question."

Let us look at some of the other circumstances adduced by the evidence as a matter of determining if Frank Garrett possessed testamentary capacity. The record reflects that some seventy legal documents, about half of which had been recorded, were introduced into evidence, all of these documents admittedly being signed by Frank Garrett. These instruments consist of bills of sale, deeds, releases, Division Order contracts with oil companies, Income Tax returns, checks (including checks in payment of Federal and State Income Tax), and numerous other instruments, all signed over a period of years. During this time, *not once* has anyone questioned Frank Garrett's competency to execute these instruments until the present litigation. *Not one single medical witness* testified that Frank Garrett was incompetent. To the contrary, the only medical witness who appeared, Dr. Joe Rushton, a respected physician of Magnolia, stated that, in his opinion, based on several conversations with Frank, the testator was competent, and it is interesting to note that the will in question was executed only twelve days

after Dr. Rushton's last conversation with Frank Garrett.

Of course, there was a close connection between the testator and the beneficiary, and it may well be that Frank, in some business matters, depended quite a bit upon the judgment of his brother, Asa. But this fact does not establish mental incompetency—or undue influence. In *Dunklin* v. *Black,* 224 Ark. 528, 275 S. W. 2d 447, we said:

" * * * It definitely appears that Hattie Boone was also the dominating personality—in business affairs; that her decisions were generally the ones accepted in matters relating to business."

After stating that this is not unusual, the court went on to say that likely

"In every family, one person's business judgment is looked upon by members of the family as being more reliable, either because of business ability, or because of business experience, and that particular one's opinion is generally given more weight in matters that arise for a decision."

This is certainly not a case where an unnatural will was made. Under all the facts, it is clearly established that Frank felt closer to his brother, Asa, than to anyone else. He had been constantly associated with his brother during his entire adult life. Actually, human nature being what it is, a stronger case for incompetency might well be made if Frank *had* named appellants (his sister and nephew) beneficiaries in the will. Lillie Garrett Vinton, the sister, had resided in St. Louis, Missouri, for the past forty years, and there is no evidence that, *during all of this time, she either visited or communicated with Frank Garrett.* Otis Harwell, the nephew, had lived in Texas for the past forty-years, and did not remember *ever having talked to Frank Garrett.* Though he had visited in this state six or seven times, and had seen other relatives, apparently no effort was made to visit with Uncle Frank. These facts are sufficient, within themselves, to suggest why neither appellant was made a

beneficiary, but there is even a more cogent reason why Frank might well have ignored these relatives. When Levi Garrett, father of Asa, Frank, Lillie, and Harwell's mother, died, he devised and bequeathed substantially all of his property to the two boys, Asa and Frank, leaving appellant Lillie Vinton and appellant Otis Harwell $1.00 each. These same two appellants (in the present case) contested the will of Levi Garrett, alleging in their complaint that for a long time Levi Garrett "had been under the undue influence of said Asa C. Garrett and Frank Garrett and each of them, and said Levi Garrett by reason of said undue influence did not make said instrument of his own free will in the disposition of his property, but made it, controlled by and under the influence of said Asa C. Garrett and Frank Garrett and each of them; the deceased resided with his son, Frank Garrett, and said son and Asa Garrett, another son of the deceased, looked after and had the personal care and attention of their father for a long time prior to and up to the time of his death. * * * said sons had influenced and dominated their father as aforesaid in the execution of said instrument purporting to be his last will and testament. During the last illness of the deceased he was grossly neglected by his said sons in that they did not provide him with the necessary nourishing foods to sustain his life, or with medicines, nursing care or the adequate service of a physician as was plainly indicated by his age, feebleness and illness, and absolutely necessary for the preservation of his life, but on the contrary permitted and caused him to die for the want of such attention, and which under the facts and circumstances amounted to criminal neglect."

Frank and Asa Garrett prevailed in this lawsuit, but harmonious family relationships are not preserved through litigation. Certainly, Frank Garrett would have been a most unusual person, if he had devised or bequeathed any property to appellants, who not only had accused him of exercising undue influence upon his father, but had further alleged that he and his brother had so neglected Levi Garrett that they were guilty of "criminal neglect," and had caused the father "to die for the want of such attention."

The inconsistency of appellants' allegations is quite noticeable. In contesting Levi Garrett's will, they asserted that Frank Garrett exercised undue influence over, and dominated, his father; yet, in the present complaint, they assert that Frank did not even have testamentary capacity. To say the least, it is out of the ordinary for a man characterized more or less as a simpleton (in the present litigation) to dominate a normal individual (as alleged in the first litigation).

There is certainly nothing unusual or abnormal about the will. This is not a case where a total stranger—or an acquaintance of a short period—inherits the property. This is not a case where those who have been close to the testator, and who might have reasonably expected to be included in a will, are left with nothing. To the contrary, the man with whom Frank Garrett had been most closely associated throughout his life—his brother, to whom, according to all witnesses, he was quite devoted—was named the beneficiary.

We are unable to say that the Chancellor's findings were against the preponderance of the testimony.

Affirmed.

Robinson, Johnson and Holt, J. J., dissent.

JIM JOHNSON, Associate Justice, (dissenting). I do not agree with the majority view. The following having been prepared for the majority was after prolonged discussion rejected and now appear as my dissent.

This is a will contest. The testator, Frank Garrett, executed a will on January 21, 1950, leaving his entire estate to his brother, A. C. Garrett. The contestants (appellants) are a sister, Lillie Garrett Vinton, and a nephew (son of a deceased sister), Otis Harwell, decedent's remaining heirs at law. Decedent died on February 27, 1962, and on March 29, 1962, appellee A. C. Garrett petitioned the Columbia Probate Court for admission of the will to probate. Thereafter appellants filed their contest. [Ark. Stat. Ann. § 62-2113 (Sup.

1963) ] After a lengthy trial the court dismissed the contest and admitted the will to probate. From this order appellants have prosecuted this appeal.

Appellants contend that the testator lacked testamentary capacity in that he was not capable of knowing the nature and extent of his property.

This court has defined testamentary capacity as follows:

"We have often defined mental capacity such as must be possessed by a testator in order for him to make a valid will. The rule has been generally expressed that sound mind and disposing memory, constituting testamentary capacity, is (a) the *ability* on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will. *Taylor* v. *McClintock*, 87 Ark. 243, 112 S..W. 405; [and other cases cited]." *Shippen* v. *Shippen*, 213 Ark. 517, 211 S. W. 2d 433 [emphasis ours].

We are here dealing with the first part of this three-fold test.

Frank, Asa (A. C.) and Lillie were the three surviving children of Levi Garrett, who died in 1946 leaving a will devising his estate to A. C. and Frank. These appellants contested that will, unsuccessfully, alleging undue influence. After extensive litigation that contest was settled by payment of $4,000 to appellants when it was conceded that an apparently valid 1931 will made generally the same provisions as the later contested will. Lillie has lived in St. Louis for some forty years and Otis in Texas, with little contact with Levi, Frank or A. C.

Levi was a successful farmer and a shrewd businessman, as is his younger son Asa. Asa bought farm land from his father and others as a young man and through hard work prospered. Sometime in the 1930's oil was discovered on Levi and Asa's property, the well known

Magnolia oil field. Frank's vast estate includes real property, enormous bank accounts and substantial oil income from property obtained and inherited from his father.

The briefs contain the abstract of testimony of sixty-three witnesses and eleven depositions; the record is voluminous. Testimony of neighbors, school mates, oil company employees who worked on the Garrett wells and townspeople is included.

The most favorable testimony in support of Frank's testamentary capacity (other than A. C.'s) was that of A. C.'s doctor, a general practitioner and a well respected man. He had occasion to see Frank five times, which was at A. C.'s home in 1949 when the doctor made professional calls on A. C.'s wife while she was dying of chronic nephritis, resultant pelagra and suffering from a psychosis common to Bright's disease. The doctor apparently visited or chatted with Frank during four of these visits, and testified that as a result of these chats he considered Frank capable of understanding the nature and extent of his property. He also testified that his talks with Frank were about crops, cotton ginning the way it used to be done, the saw mill, all of which "reminded me [the doctor] of old times. The old timer talked like my dad used to, about your having to get up when you were a kid early in the morning and go outside in the field and run the cows out." Frank was never a patient of the doctor's and apparently the only contact the witness had with Frank was the casual conversations which occurred during the doctor's treatment of Frank's sister-in-law who at the time was at the point of death.

The bulk of the testimony in the record related to Frank's later years, hardly surprising considering that he died in 1962 at eighty-three. However, there was testimony of at least five witnesses who had gone to school with Frank at the ungraded Mount Nebo school. All of these witnesses were a few years younger than Frank, but the gist of the testimony is that when he did go to school, he was quiet, didn't join the other children in games or talking, when he tried to read the teacher had

to supply many or most of the words, that he probably didn't finish the first or second reader, that the other children made fun of him and considered him dull or stupid.

After growing up, Asa, six years Frank's junior, bought land and farmed successfully, married and raised a family; Frank continued to live with his parents and did so until their deaths. His father went into partnership with Asa in a cotton gin and Frank worked there as a helper, as well as at the Garrett saw mill. There is testimony that as a young man, Frank was quiet, and that when he ventured to say something in a conversation, his father would say with a smile, "Frank, I don't know whether you know or not," which would end his attempt. Years later when Frank was talking to a live stock man about pigs, A. C. told the man, "Don't pay any attention to him, he is always talking about damned old pigs and he hasn't got any use for them."

Most of the testimony dealt with the period following discovery of oil on the Garrett property in the 1930's. A number of the men who worked in the oil field testified. The trial court referred to them as "transients". While it is true they were subject to transfer by the oil companies, we note that these workers saw and knew Frank over a period of, at a minimum, several years, and some for twenty or thirty years. These men saw Frank almost daily since this field occupied in part the Levi Garrett farm. Frank is pictured as being as uncommunicative and inattentive as a child. Frank spent much of his time walking in the woods. When he came to the field, the men would speak to him and he would have little to say except to comment on the weather or his crop of peas. In response to their remarks relative to his wealth, he would say, "No, he didn't have anything because the government took everything for taxes, bud (Asa) said so," or "No, he didn't have any money because the wells were turning to salt water, Bud said so," or (according to one witness), "No, he didn't have any money because it took everything to settle with Sister, Bud said so." Frank's attention span was so short he would then wander off back into the woods like a child. One man who

lived next door to Frank for four years testified that
Frank would bring him a quarter and ask him to buy
"beefsteak, cheese and crackers" for Frank's dinner.
(Frank was then about sixty.) The man would buy all
he could for the quarter and take it to Frank. This oc-
curred a number of times, as was also testified to by the
man's wife. There was quite a bit of testimony that
Frank desperately wanted a water well and a "Sunday
car." The "quarter" neighbor and his wife testified
that some thirteen years after they moved from Columbia
County they returned for a visit and happened to see
Frank. Frank recognized his former close neighbor of
many years and called him by name. When the man
asked Frank what he was doing at that particular place
(on the side of a new highway), Frank told him, "He
come over there . . . every Thursday, and the man on
the highway promised him a new automobile and he never
had brought it, and he went over there every Thursday
to see if he brought his new automobile."

Another neighbor testifed about giving Frank a ride
to town one day. He also picked him up on the way back
and when the neighbor stopped to do a little business,
Frank went to someone who was selling apples. Frank
was told that the apples were five cents each or three
for a dime. Frank gave him ten cents and took two ap-
ples, one for himself and one for the neighbor. When the
neighbor kidded Frank about shortchanging himself, he
called the neighbor a liar. Another neighbor testified
that one day he gave Frank a ride and when he got near
Frank's home, Frank got out and hid peanuts under some
leaves behind a fence, "because he didn't want Asa to
know about the peanuts, he would take them away from
him." Another man testified that one day in the woods
he saw Frank hide something in a tree, and after Frank
was out of sight, investigated and found peanuts in the
crotch of the tree.

Almost all of the witnesses commented on Frank's
filth and aroma, especially after Levi's death in 1946.
(Levi had had a woman who cooked and washed for
them.) Frank apparently never changed clothes, never
washed them, and wore them until they wore out. One

witness testified that Frank's brother had said that Frank smelled so bad he and his son couldn't eat when Frank was in the house; and another time, that they tried to get Frank to put on clean clothes, but had been unable to make him do so. Most of the witnesses agreed that Frank was odorous within conversation distance.

Several of the oil field witnesses testified that Frank told them he looked forward to warm weather so he could wash in the creek. A number of them testified that he said a number of times he would rather have a water well than the oil wells so he could water his garden and grow water "millions" (melons), which he loved.

He lived in penury, extreme poverty. Filth was his constant companion. The simplest conveniences were denied him — running water, electricity, even gas, although he lived adjacent to an oil field. When he gave the neighbor the quarter to buy groceries, he would say that he didn't need much. Another testified that Asa complained that he couldn't get Frank to eat enough, that Frank wanted to save the food. A grocer testified that when Frank came in for his loaves of bread (apparently Frank's primary food), cheese and peppermint sticks, if Frank had a bill (usually a $5, once a $20), Frank would say that had to do him a long time. When he gave her (the grocer) the $20 bill, Frank said Asa said the government got all their money so this twenty had to do him a long, long time. A passerby called a doctor to see Frank in 1956 after Frank was found collapsed by the roadside. This doctor testified in part as follows:

"I found him to have bronchial pneumonia. Someone else was there at the time, but I do not remember who they were. I know Mr. A. C. Garrett, either he or some of his sons were there. I don't remember. Frank had a rattle in his chest and he was spitting up blood and I advised that he be sent to the City Hospital at once. I gave him a shot of penicillin and he said he didn't like the hospital and didn't want to go because it cost too much. Frank said that. The blankets on the bed were very filthy. There was bread in the window with syrup on it and the house was very untidy and unclean. Frank

hadn't shaved and hadn't had a hair cut in a long time and he had the appearance of not being clean.''

Yet there is in evidence Frank's 1956 federal income tax return showing a taxable income for that year (after deductions) of $41,144.24.

Frank's brother in a so-called exploratory deposition testified that Frank was quite capable of carrying on his own business, and did so regularly. However, examination of employees of various banks that housed Frank's and Asa's joint accounts revealed that few of them had ever seen Frank in a bank although Asa was a familiar sight, making deposits to the various accounts. It is established that Asa would deposit Frank's oil income checks and hold out a little cash for Frank. Courthouse employees testified that they never saw Frank and that Asa took care of all assessment and other tax matters. An accountant testified that he had prepared Frank's income tax returns for the year 1951 on, but he had never seen Frank and had been hired and paid by Asa. A respected attorney testified that he had handled litigation for many years for the Garretts but he had never seen Frank in his office until shortly after settlement of Levi's estate. Frank came in with Asa, and Asa told the attorney Frank wanted a will. When the attorney asked Frank who he wanted to will his property to, Frank said, ''I want to leave it to me.'' The attorney explained that he (Frank) couldn't receive his own property after his own death. The attorney testified that:

''I then asked him again, what do you want to do with your property. I don't remember the exact words of any of the rest of the conversation, but I do remember that he said he wanted to leave something to (and he gave a feminine name). I don't recall what the name was. He said I want to leave something to this girl and I want to leave something to brother A. C. Mr. A. C. Garrett, who was seated by my desk, then got up and said, I am sorry but we have to go. I don't remember the exact words, but I do know he said, we will have to go and we will come back later. They got up and walked out and to my knowledge, neither of them ever came back into our law firm again, prior to the death of Mr. Frank.''

Some months later Frank executed a will at the local bank which the bank president had had a local attorney draw at the bank's expense. This attorney had not seen Frank, but simply drew the will on directions related to him by the bank president (who had done business with Asa for years and who had on deposit — at no interest — much of the money involved in this litigation). After the will was executed, it was immediately placed in Asa's lockbox in the same bank.

There are a number of instruments—deeds, releases, agreements, etc.—of record to which Frank was a party. One notary public testified that she had seen Frank sign a particular instrument some years earlier, and then on recall testified that after reflection she remembered that Asa had carried the instrument out of her presence to get Frank's signature on it. There seems to be no dispute that Frank could write, or at least sign his name, but other than the will, only one or two witnesses testified that they had actually seen him sign his name, and that only because they had notarized his signature.

Asa was present during the entire trial and heard all of the myriad testimony showing the obvious lack of testamentary capacity of his brother, and chose not to take the stand to deny or refute the testimony of any of the witnesses or to subject himself to cross-examination. We have only his "exploratory" deposition which in part describes events immediately prior to Frank's death:

"He never grunted in his life. He wasn't sick at all before he died. He was up over there the day before he died. Ray [Asa's son] went over there and lit the heater and the stove in there and got his breakfast on and he was in the kitchen there and he tended to it and finished it up and ate whatever he got ready. The next morning they found him dead. He wasn't sick. Ray went over there and found him. Ray told me about it, he came back over there and told me. He lived over there by us where we could kinder look after him."

Appellants properly offered the testimony of the undertaker as follows:

"It was stated that [he] would testify that he was called to get Mr. Frank Garrett's body after his death, that he found him in the little house across the road from A. C. Garrett, that it was a real cold day when he went out there and rigor mortis had completely set in; that the skin on Frank Garrett's leg had rotted off to the bone, that three of his toes had no skin on them, and his instep bone was without skin on the top of it; that he had been excreting in his clothes for some days; that he had three pair of clothes on that were so filthy that he could not unbutton them and take them off, and they were so stiff with the filth that he had to cut them off with a knife; that it took three knives to cut them all off; that it was the only body that was so stinking that they couldn't take care of it in the undertaking parlor and had to carry it out to the garage; that the body was so deteriorated that they were unable to obtain any circulation to embalm it and therefore, requested permission to seal the casket and such permission was granted by Mr. A. C. Garrett's family. He will testify that the body was filthy and when he attempted to wash the body, when he touched the skin it would fall off and they were unable to clean it up. He will also testify that during his entire years in the undertaking business, which is more than fifteen years, he had never seen a body in such terrible condition even though he had handled some bodies found three days after death, where maggots had set in, and once where a body had been submerged for a couple of days in water."

On the whole case it is inescapable that Asa had allowed his mentally weak brother very small amounts to live upon, advising him that his sister had taken it, that the government was getting it, or that the wells were going to salt water, resulting in Frank's firm fixation that they were practically at starvation's door. All in all, this case presents in essence a portrait of a person of limited capabilities, looked after by his family, assigned simple jobs at the gin, the saw mill or on the farm which he was capable of doing and did do; a person of very limited intellectual scope who was completely unable to translate oil wells into a water well. That is to say Frank did not, and I think could not, visualize the oil

wells (that he apparently so disliked for ruining the farm) as an income-producing means of obtaining the two things that were his heart's desire, a water well and a car.

The question here is *not* whether Frank Garrett would have willed his property as is provided in the instrument here involved, but rather whether he was competent to make a will. On trial de novo on the record before us, it is my view that the testator not only did not know the extent of his property but that he was incapable of so knowing, which is one of the essentials of testamentary capacity. For the lack of testamentary capacity, the decree of the court admitting the purported will to probate should be reversed.

For the reasons stated, I respectfully dissent. I am authorized to say that Justices Robinson and Holt join me in this dissent.