SIMMONS FIRST NATIONAL BANK, ADMINISTRATOR v.
DEWEY LUZADER, ET AL

5-4809                                        438 S.W. 2d 25

Opinion Delivered March 10, 1969

*Wright, Lindsey & Jennings* for appellant.

*Fenton Stanley* for appellees.

CARLETON HARRIS, Chief Justice.   This appeal involves the validity of a written contract entered into by N. F. Yarbrough and his nephew and his wife, Dewey Luzader and Anna Pearl Luzader, appellees herein. The instrument provided that the Luzaders should have $12,000.00, which was on deposit with the Southern Federal Savings and Loan Association in Pine Bluff, if appellees gave him a home until his death.   A factual background is as follows:

Yarbrough's wife died on September 19, 1966, Mr. Yarbrough being 84 years of age at that time.   On the

day following Mrs. Yarbrough's death, and also a few days later, Yarbrough, together with his brother, Claude, went to the Southern Federal office for the purpose of transferring savings accounts. Yarbrough held four or more such accounts, which totaled more than $49,-000.00. One account, in the amount of $7,000.00, was placed entirely in the brother's name. Remaining accounts were changed to require the signatures of both brothers in order to make withdrawals. Subsequently, Frank (N. F.) Yarbrough returned to the Southern Federal office on one other occasion to discuss the accounts with the company secretary.

Yarbrough had long expressed the desire to live with the Luzaders in the event of the death of his wife, and he went to the Luzader home at Leola, Grant County, Arkansas, three days after the funeral of Mrs. Yarbrough. On October 25, Mr. Yarbrough, accompanied by Anna Pearl, went to the office of Pierce A. Reeder, postmaster at Leola, and a contract was handed to Reeder, Mrs. Luzader requesting the postmaster to "notarize" it. Reeder testified that he read it, and concluded that it should be drawn up in a form where it could be witnessed by two other people.[1] When Mrs. Luzader left to find two persons, Reeder typed up the agreement, and made it ready for signatures. The postmaster testified that he copied the paper handed him, and added the part about the presence of witnesses. Mr. Yarbrough then executed the typed contract, and the two witnesses signed their names.[2]

---

[1] Reeder was under the impression that the instrument was a will.

[2] "When and if Dewey Luzader and his wife, Anna Pearl Luzader gives me a home until my death, it is understood that they shall have the sum of Twelve Thousand Dollars ($12,000.00) of my money on account in the Southern Federal Loan and Savings at Pine Bluff, Arkansas or wherever it may be at the time of my death. Signed this 25th day of October 1966. Signed /s/ N. F. Yarbrough. In the presence of the following witnesses and in the presence of each other on this 25th day of October, 1966.
/s/ Olen Biggs, Leola
/s/ Austin Lamb, Leola."

On December 5, 1966, Mr. Luzader petitioned the Probate Court for the appointment of a guardian for Yarbrough, the allegations being that the latter was incompetent, because of senility and old age. On December 9, the court held Yarbrough incompetent, and appointed Simmons First National Bank of Pine Bluff as guardian. At this hearing, Claude Yarbrough relinquished the interest in his brother's savings accounts, and the court awarded appellees the sum of $150.00 per month for keeping the old man. Yarbrough died on August 21, 1967, and appellant bank was named administrator of the estate. The Luzaders filed a claim for $12,000.00 based on the written contract heretofore mentioned. The bank refused to allow this claim, but on hearing, same was allowed by the Probate Court. From the judgment allowing the claim in the amount of $12,-000.00, the bank brings this appeal. For reversal, it is asserted that the court erred in holding that the administrator had failed to overcome the presumption of Yarbrough's competency, and it is also alleged that the contract was unenforceable for failure of consideration.

All parties agree that the document in question was not a conveyance, or will, but was a contract. The court, in its written opinion at the conclusion of the case, held that the bank had "failed to overcome the presumption of competency that follows the execution of a written instrument." Appellant disputes that there is such a presumption, and points out that the Chancellor cited no case in support thereof. We disagree with this argument. In *Dalton* v. *Polster,* 200 Ark. 168, 138 S.W. 2d 64, this court said:

"Having pleaded her incompetency, the burden was on appellants to show it. *Incompetency is never presumed, but the contrary is.*"[3]

In *Harris* v. *Harris,* 236 Ark. 676, 370 S.W. 2d 121, we commented:

---

[3]Our emphasis.

"There is a presumption of law that every man is sane, fully competent and capable of understanding the nature and effect of his contracts."

*Harris* v. *Harris* is also quoted with approval in *Union National Bank of Little Rock, Trustee* v. *Smith,* 240 Ark. 354, 400 S.W. 2d 652. Of course, in addition, the execution of the contract having been shown, the burden of proving incompetency rested with the bank, since it sought to invalidate the instrument. The cited cases are likewise authority for this last.

As a matter of proving the mental incompetency of Yarbrough, appellant relies upon the testimony of Claude Yarbrough, the brother of the deceased, Connie Haner, a niece of N. F. Yarbrough, and Hattie Bea Blaser, Secretary of the Southern Federal Savings and Loan Association of Pine Bluff. Mrs. Haner testified that she probably saw Yarbrough twice between the time of his wife's death and the execution of the contract with the Luzader's. When interrogated as to her uncle's mental condition at the time of his wife's death, she replied:

"Just like he always was the last few years. Just a little, well, you'd have to know Uncle Frank to know him. He was just sort of here and there."

Mrs. Haner said that he could remember some things pretty well, but could not remember others; that he had "been like that for years." When asked if he had an understanding of the nature and extent of his property, the witness said:

"Well, he knew he had his money and we talked about it and different things like that. He liked to talk about his money to me. * * * He didn't know how much he had, really. He didn't know that, no."

She said that in April, 1967, a relative had died, and she talked to her uncle in Gurdon; that he told her

at that time that he wanted to go to Pine Bluff, and get his money out of the bank, because Anna Pearl had written a paper that would give her $12,000.00, and he didn't want her to have it. She also said that he desired to move back to Pine Bluff. The witness made clear that she was not saying that her uncle had been compelled to sign the paper. "He said that she wrote out a paper and I signed it that I would give her this money." Mrs. Haner did agree that Yarbrough had been anxious to live with his nephew and wife at the time of the death of his wife.

Claude C. Yarbrough lives in Little Rock. He testified that he went to the N. F. Yarbrough home in Pine Bluff the morning after Mrs. Yarbrough's death, and "he [N. F. Yarbrough] told me, as he had previously, that he wanted to sign over all of his savings in my name." They went to the Southern Federal Savings and Loan Association, and $7,000.00 was transferred to the witness; the balance was not transferred, because he did not have the "deposit slips." N. F. Yarbrough did not know where these were located, but a stepdaughter, who arrived the next day from Illinois, produced them, the balance amounting to about $42,000.00. The Yarbroughs returned to the savings and loan office, and these amounts were placed in joint accounts for the two brothers, with right of survivorship; during their lifetime, the money could not be drawn out without both signatures. Claude testified that his brother did not know how much money he had with the savings and loan, and he said that N. F. argued with the secretary of the association that he only had $21,000.00. The witness stated that N. F.'s mind was "bad then," and it kept deteriorating until he was completely blank the last month or two of his life. While Claude testified that, at the probate hearing, he agreed to turn over all of these accounts to the guardian, it appeared on cross-examination that he might have been a little reluctant to do so.

The strongest evidence offered by appellant was that of Hattie Bea Blaser, the secretary for the savings and loan association. She said that N. F. Yarbrough, accompanied by Claude, came to the office on September 20, and informed her that his wife had passed away the night before, and he would like to transfer his money to his brother's name. She told him that he would need his pass book and certificates of deposit, and he then asked how much money he had. After checking the accounts, Mrs. Blaser advised that there was $42,000.00 in four different accounts. Referring to the deceased, the witness stated:

"* * * I've known him for several years. He was a peculiar person in a certain sense. One account he would carry in a different name. One would be Newton F. and one would be in N. Frank Yarbrough or N. F. Yarbrough. He always, you know, in opening a new account, would use his name in a different manner."

Mrs. Blaser said that he didn't seem to have any idea of how much he had on deposit, and that it was her personal opinion that he didn't understand the effect of transferring the accounts. She added that, for the last three or four years, N. F. Yarbrough had not been as alert as she had known him to be in years past; that for the last two years, there never was a time when he knew what he was doing. She later modified this statement, saying that, during that period, she did not believe him able to take care of a business matter.

Mrs. Luzader testified that Yarbrough came to Leola to live with the Luzader family three days after his wife's death; that he died on August 21, 1967, in a hospital, after suffering a stroke on July 7. She detailed the necessary duties in taking care of Mr. Yarbrough, who, after a few months, lost control over his bodily functions. Appellee said that sometimes the bathroom would have to be cleaned two or three times

a morning, and that this lack of control was evidenced in the family automobile; that it was difficult to get Yarbrough to a barber and back home without changing his clothes; that her 16-year-old son would bathe him, and they would dress him. She said that Yarbrough was happy in the home, but embarrassed.

Mrs. Luzader testified that she received the $150.00 per month allowed by the probate court for Mr. Yarbrough's maintenance, and that Yarbrough paid her an additional $150.00 per month from his railroad retirement check after the first of the year, 1967.

Glenn Paul Luzader, the son, testified that on one occasion, when they were sitting in the den, he heard his Uncle Frank tell his mother that Yarbrough wanted her to have the $12,000.00 after he passed away.

Iona Jones, daughter of the Luzaders, testified that she had many times, as a child, heard her uncle express the desire to live with her parents if he out-lived his wife; he did not want to go to a home for old folks. She said that she would visit on weekends following his move to Leola, and that he had told her that he was very thankful that he didn't have to go to a rest home, but could spend the rest of his life with her folks.

Evelyn Smith, the housekeeper, had been going to the Luzader home one day per week for years, but after Yarbrough moved in, Mrs. Smith worked two days per week. She said that she helped Mrs. Luzader rearrange the furniture, giving Mr. Yarbrough the bedroom closest to the bathroom, and that she had many conversations with him while she was ironing. Mrs. Smith stated that he would mention that he did not want to go to a rest home, and that he wanted Mrs. Luzader

to have a part of his savings.[4]

We agree with the Chancellor that the evidence was insufficient to establish the incompetency of Mr. Yarbrough. It is noticeable that no medical evidence was introduced that Yarbrough was incompetent, though, according to Mrs. Blaser, he appeared, in her opinion, to have been unable to attend to business matters for the last two years before his death. Medical testimony of incompetency, though certainly not essential, is important and potent evidence in this type of case, and, in *Harwell* v. *Garrett*, 239 Ark. 551, 393 S.W. 2d 256, we emphasized that not a single medical witness testified that Frank Garrett was incompetent.

The fact that Yarbrough did not seem to understand the result of a joint account, or did not know just how much money he had, is, in our view, of no great significance under the circumstances of this case. We daresay there are many people in their 80's, who have but little knowledge of business affairs, and who have difficulty in remembering details. Certainly, Claude Yarbrough must have considered that his brother was competent to make the changes in the accounts, or he would not have permitted this to be done. It would appear, according to the testimony of Mrs. Blaser, that N. F. Yarbrough had acted peculiarly for a number of years. She mentioned that each time he opened an account, he would use a different version of his own name, but peculiarities do not establish one's mental incomp-

---

[4]H. B. Atwood, trust officer for Simmons First National Bank, produced a letter which he had received from Mrs. Martha Frances Grothe Lyche, a stepdaughter of N. F. Yarbrough, in which she said that her mother and stepfather did not want to be placed in a nursing home; that Mr. Yarbrough had always desired to live with the Luzaders, and that the Luzaders were giving him a good home. The introduction of the letter was objected to as hearsay, and the Chancellor reserved his ruling. He never did pass upon the admissibility of the evidence, but apparently did not consider it, since it is not mentioned in a rather lengthy opinion rendered by the trial court.

etence.    In *Harwell* v. *Garrett, supra,* in quoting from Volume I, Page on Wills, § 12.37, we said:

"The fact that the testator was filthy, forgetful and eccentric, or that he was miserly and filthy, or that he was blasphemous, filthy, believed in witchcraft, and had dogs eat at the same table with him or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on for two weeks at a time, or that he would leave his home only at night, and would count or recount his money, or that he was high tempered and violent, or was irritable and profane, or that testator thought that others were plotting against him and was afraid to go out in the dark, or that he was inattentive when spoken to and mumbled when trying to talk, does not establish lack of capacity."

It is readily apparent that Mr. Yarbrough's acts in no wise compared with the language just quoted, and we have many times said that being forgetful and eccentric does not establish lack of mental capacity.

Of course, it is necessary that appellant show the lack of Yarbrough's mental capacity to enter into the contract *at the time this instrument was executed.* Here, there is not one line of evidence relative to that point offered by the appellant; in fact, the only effort was an attempt to show that Yarbrough was mentally deficient thirty-eight days before he signed the agreement.    In *Petree* v. *Petree,* 211 Ark. 654, 201 S.W. 2d 1009, Mrs. Anna Petree executed a contract on June 22, 1942. Lay evidence was offered that she was not able to transact business in June, 1942, and medical evidence was offered to the same effect, although the doctor so testifying did not examine Mrs. Petree thoroughly until September or October of that year.    The physician stated that her condition had not come on suddenly; however, he was unwilling to testify that she was incompetent in June.    We held Mrs. Petree competent.    In the instant

litigation, we reiterate that there is not one iota of evidence to the effect that Mr. Yarbrough was mentally incompetent in October, 1966.

This court has said that mental weakness, though not to the extent of making one incapable of executing a deed, may cause a person to be more susceptible to fraud, duress, or undue influence, and that when that mental incapacity is coupled with any of those conditions, a contract may be voidable. *Cain* v. *Mitchell,* 179 Ark. 556, 17 S.W. 2d 282. Here again, there is no proof of fraud, duress or undue influence. One paragraph in appellant's brief is devoted to the argument of undue influence, and this is based upon a comment by Mrs. Blaser that it was her personal feeling that Yarbrough was easily influenced by anyone close to him. It hardly seems necessary to state that that testimony comes nowhere near establishing that Mrs. Luzader exercised undue influence upon the uncle.

It is argued that appellees were well paid for their services in taking care of Mr. Yarbrough by virtue of the fact that they received $300.00 per month. One hundred and fifty dollars ($150.00) of this was allowed by the Probate Court, and the other $150.00 was paid to Mrs. Luzader by Yarbrough from his retirement check. Appellant says that certainly Mr. Yarbrough did not contemplate, in agreeing that they should receive $12,000.00, that appellees would also receive $300.00 each month; that accordingly, the consideration for the agreement fails. We do not know what Mr. Yarbrough contemplated, but the evidence certainly indicates that he was quite devoted to the Luzaders.

It is established by the evidence, in fact, undisputed, that Mr. Yarbrough had a strong aversion to being placed in a nursing, or old folks, home; he expressed the desire many times to live with his nephew and wife. It is likewise established that the Luzaders took care of

Mr. Yarbrough, as they agreed to do; in other words, they carried out their part of the agreement.

Let it be remembered that this is not a case where a man is depriving his wife or children of needed monies—this is not a case where loved ones are cast aside for strangers. To the contrary, all heirs are collateral heirs, none of whom, from the record, had anything to do with helping Yarbrough accumulate his savings. Nor does it appear that the other relatives were anxious to take care of this aged man.[5] Also, the Luzaders are not receiving all of his money; in fact, including the amount allowed by the Probate Court, they will be receiving but little more than one-fourth of the estate.

We find no reversible error.

Affirmed.

BROWN, J., not participating.

---

[5]Mrs. Connie Haner testified emphatically that Yarbrough wanted to go to the home of the Luzaders in September, 1966, twice stating, "Oh, yes. He wanted to go there." However, this testimony was a contradiction of earlier evidence given by this witness on direct examination. From the record:

"Q. Has he told others of the family, other members of the family, that he was willing or that he wanted to go live with them?

A. Yes. He had told different ones from time to time that he would like to live with them. He never did tell me. I was a widow or I guess I might have wound up with him."